**Jamie E. CONDIO, Executrix of the Estate of Louise V. Johnson, Deceased, Individually and as Administratrix of the Estate of Darby K. Breen, Deceased, Appellee**

v.

**ERIE INSURANCE EXCHANGE, Erie Insurance Group, Appellant**

**Jamie E. Condio, Executrix of the Estate of Louise v. Johnson, Deceased, Individually and as Administratrix of the Estate of Darby K. Breen, Deceased, Appellant**

v.

**Erie Insurance Exchange, Erie Insurance Group, Appellee.**

Superior Court of Pennsylvania.

Argued March 29, 2005.

Filed April 25, 2006.

Reargument Denied June 26, 2006.

---

William H. Lamb, West Chester, for Erie Insurance.

Bernard J. Hessley, Warren, for Condio.

BEFORE: HUDOCK, POPOVICH and JOHNSON, JJ.

OPINION BY HUDOCK, J.:

¶ 1 Erie Insurance Exchange and Erie Insurance Group (Erie) appeal from the judgment entered April 28, 2004, in favor of Jamie E. Condio, administratrix of the estate of Darby K. Breen (Breen). The Estate also appeals, raising separate issues. We vacate the judgment and remand for entry of judgment notwithstanding the verdict (judgment nov) in favor of Erie.

¶ 2 This matter arises from an underinsured motorist (UIM) claim based on a single vehicle accident involving Breen's car. The trial court rendered findings about the accident, which we summarize as follows: On the evening of April 12, 1991, and the early morning hours of April 13, 1991, Breen and Karen E. Sailar (Sailar) spent time together at various places where they both drank significant amounts of alcohol. At approximately 2:00 a.m., Breen, Sailar and a friend, Corey Blythe (Blythe), left an outdoor party near the Jackson Valley Country Club; Breen drove them to Blythe's house. Blythe observed Breen in the driver's seat when he exited the car and headed for his house. Blythe noted on the clock in his house that it was 2:30 a.m. Trial Court Opinion, 1/12/04, at 1–2 (findings of fact 1, 2).

¶ 3 Breen and Sailar intended to drive to Scandia where Sailar's car was located so she could drive home. At approximately 3:00 a.m., Breen's vehicle left the roadway on a curve, traveled down an embankment approximately 180 feet and hit a tree. The car came to rest leaning toward the passenger side. Breen was found deceased in the passenger seat of the vehicle with his head against the tree and his legs pinned under the dashboard. Sailar was found lying on top of Breen badly injured and unconscious. Trial Court Opinion, 1/12/04, at 2 (findings of fact 3, 4).

¶ 4 Trooper Hiles Maines investigated the accident, arriving at the scene after Sailar had been removed from the vehicle but while Breen was still in it. Trooper Maines indicated in his report that the seatbelts were cut, but he could not tell whether they were being used at the time of the accident. He also noted he was not certain who was driving the car. When deposed, Trooper Maines stated that he thought Sailar was the driver based on the location of the occupants. In his supplemental report, Trooper Maines noted that he interviewed Sailar and Blythe. Blythe stated that, when he exited the car, Breen was in the driver's seat. Sailar stated that she remembered walking down a steep hill at the country club; she did not think she would have been driving Breen's car because there was no reason she could think of why she would be driving. In her deposition, Sailar testified that she remembered Breen entered the driver's side of the car when they left the country club. Trial Court Opinion, 1/12/04, at 2 (findings of fact 5, 6).

¶ 5 At the time of the accident, Breen's vehicle was covered by a policy with Lumberman's Mutual Insurance Company, which included bodily injury limits of

$15,000.00 per person, $30,000.00 per accident, but no uninsured or underinsured motorist coverage. Breen was also covered under an automobile liability policy that his mother, Louise Johnson (Mrs. Johnson), had with Erie (the Erie policy), which provided uninsured motorist and underinsured motorist coverage in the amount of $100,000.00 per person stacked for two vehicles. This policy had an excluded driver endorsement for Breen, meaning he could not recover if he was a driver. Trial Court Opinion, 1/12/04, at 2 (finding of fact 7).

¶ 6 On April 8, 1992, Attorney Gary Eiben filed an action in Warren County on behalf of Sailar against the Estate in which she alleged that she was the passenger in Breen's vehicle. In addition, Sailar filed a complaint against her mother's first party and underinsured carrier, Allstate Insurance, in which she again alleged that she was the passenger. In connection with the Sailar litigations, depositions were taken of Trooper Joseph Azzato, Corey A. Blythe, Terry Carlson, Timothy Carlson, Deputy Coroner Donald Lewis, Corporal Robert J. Lucia, Trooper Hile C. Maines, Tanya Orcutt, Arlene Sailar, Karen E. Sailar and Fire Chief Patrick Shine. *Id.* (findings of fact 8, 9).

¶ 7 On May 20, 1993, Attorney Bernard J. Hessley (Attorney Hessley), counsel for the Estate, wrote to Erie, making a claim for UIM benefits due Breen, demanding arbitration, and naming an arbitrator. *Id.* at 4 (finding of fact 19). On May 24, 1996, a UIM arbitration panel determined that Sailar was the driver of Breen's vehicle. Trial Court Opinion, 1/12/04, at 7 (finding of fact 34). On July 2, 1996, having stipulated to full coverage if the panel determined that Sailar was the driver, Erie paid the UIM claim with interest to the Estate. *Id.* (finding of fact 35).

¶ 8 We glean the procedural history of this case from the certified record. Eight days after receiving the UIM benefits, Mrs. Johnson filed suit against Erie on behalf of the Estate pursuant to 42 Pa. C.S.A. section 8371, alleging that Erie acted in bad faith in its handling of the UIM claim. Mrs. Johnson died after the complaint was filed. Breen's sister, Jamie E. Condio, was appointed executrix of Mrs. Johnson's estate and substituted as the Administratix of the Estate. On July 25, 2001, Paul H. Millin, P.J., granted summary judgment to Erie. The Estate appealed the grant of summary judgment. A panel of this Court reversed and remanded, concluding that Erie had not met its burden of establishing that no genuine issue of material fact existed as to whether Erie acted in bad faith. *See Condio v. Erie Insurance Exchange,* No. 1697 WDA 2001, 815 A.2d 1134, unpublished memorandum (Pa.Super. filed October 21, 2002). Following a five day bench trial on remand, Judge William F. Morgan entered a verdict for the Estate and awarded it interest, attorney fees, punitive damages, and costs. *See* Trial Court Order, 1/9/04.

¶ 9 Erie and the Estate filed post-trial motions. The trial court denied the post-trial motions, but recalculated the interest due to the Estate and ordered that the original award of interest be reduced. Trial Court Order, 4/16/04. Both parties appealed the judgment entered on April 28, 2004, in favor of the Estate and, along with the trial court, have complied with Pa.R.A.P.1925.

¶ 10 Erie raises five issues on appeal which we paraphrase as follows:

1. Whether the trial court erred as a matter of law when it concluded that "deficiencies" in Erie's internal investigation of the Estate's UIM claim may support a finding of bad faith in circumstances where further investigation would not have uncovered any additional

probative evidence as to the identity of the driver?

2. Whether the lower court erred as a matter of law when it concluded that deficiencies in Erie's "investigation" of the Estate's UIM claim may support a finding of bad faith where, at the time the "investigation" took place, the Estate had not exhausted all other available coverage?

3. Whether the lower court erred as a matter of law in admitting and relying on the testimony of the Estate's expert Barbara Sciotti where her testimony misstated Pennsylvania law regarding the duty of an insurer to its insured in the context of a UIM claim?

4. Whether the lower court erred as a matter of law and violated Erie's due process rights under Pennsylvania law and the Pennsylvania and United States Constitutions by awarding punitive damages in circumstances where the conduct at issue did not rise to the level of bad faith, let alone the requisite level of outrageousness, and where the award was constitutionally excessive?

5. Whether the lower court erred as a matter of law in awarding interest and attorney's fees to the Estate where the Estate's evidence as to the amount and reasonableness of the attorney fees and their relationship to the hours spent pursuing claims on which the Estate was successful was insufficient?

*See* Erie's Brief at 3.

¶ 11 In this appeal, Erie seeks judgment nov.[1] Our Supreme Court has stated that the standard of review for an order "granting or denying judgment notwithstanding the verdict is whether there was sufficient competent evidence to sus-

tain the verdict." *Brown v. Progressive Insurance Co.*, 860 A.2d 493, 497 (Pa.Super.2004) (citing *The Birth Center v. The St. Paul Cos.*, 567 Pa. 386, 397, 787 A.2d 376, 383 (2001)). We must view the evidence in the light most favorable to the verdict winner and give him or her the benefit of every reasonable inference arising [therefrom] while rejecting all unfavorable testimony and inferences. *Birth Center*, 567 Pa. at 397, 787 A.2d at 383. Furthermore,

[judgment nov] should be entered only in a clear case, where the evidence is such that no reasonable minds could disagree that the moving party is entitled to relief. Review of the denial of [judgment nov] has two parts, one factual and one legal:

Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded evidence at trial, we will not substitute our judgment for that of the finder of fact.

*Van Zandt v. Holy Redeemer Hosp.*, 806 A.2d 879, 886 (Pa.Super.2002) (citation omitted), *appeal denied*, 573 Pa. 686, 823 A.2d 145 (2003).

We review the decision of a trial court in a non-jury case to determine "whether the findings of the trial court are supported by competent evidence, and whether the trial court committed error in the application of law." *Bonenberger v. Nationwide Mut. Ins. Co.*, 791 A.2d 378, 380 ([Pa.Super.] 2002). We also note that the factfinder's conclusions must be based upon competent evidence and reasonable inferences therefrom:

1. In the alternative, Erie seeks a new trial. *Because we will grant Erie's request for judgment nov, we need not address its alternative claims. See Brown v. Progressive Insurance Co.*, 860 A.2d 493, 497 n. 5 (Pa.Super.2004)

(where court grants request for judgment nov, claims supporting alternative request for new trial need not be addressed). Given our disposition of Erie's issues, we need not address the Estate's appeal.

The factfinder may not be permitted to reach its verdict merely on the basis of speculation and conjecture, but there must be evidence upon which logically its conclusion may be based. Therefore, when a party who has the burden of proof relies upon circumstantial evidence and inferences reasonably deducible therefrom, such evidence, in order to prevail, must be adequate to establish the conclusion sought and must be so preponderate in favor of that conclusion as to outweigh in the mind of the fact-finder any other evidence and reasonable inferences therefrom which are inconsistent therewith.

*Van Zandt,* 806 A.2d at 886 (citations omitted).

*Brown,* 860 A.2d at 497–98.

¶ 12 Broadly speaking, Erie argues that the trial court erred in failing to grant judgment nov because the Estate failed to establish by clear and convincing evidence that Erie acted in bad faith toward the Estate. Specifically, Erie claims that its internal investigation of the Estate's UIM claim cannot support a finding of bad faith because (1) the UIM claim was not ripe at the time of Erie's investigation and initial denial; (2) further investigation would not have uncovered any additional probative evidence as to the identity of the driver; and, as the trial court found (3) Erie did not act in bad faith by proceeding to arbitration on the question of who was driving the vehicle at the time of the accident.

¶ 13 The Pennsylvania Legislature has created a statutory remedy for an insurer's bad faith conduct. The statute provides:

In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

42 Pa.C.S.A. § 8371. This Court has noted that the bad faith statute extends to the handling of UIM claims, despite their similarity to third party claims. *Brown,* 860 A.2d at 500 (citing *Bonenberger v. Nationwide Mutual Insurance Company,* 791 A.2d, 378, 380 (Pa.Super.2002)). Also, "section 8371 is not restricted to an insurer's bad faith in denying a claim. An action for bad faith may extend to the insurer's investigative practices." *O'Donnell v. Allstate Insurance Company,* 734 A.2d, 901, 906 (Pa.Super.1999).

¶ 14 Although the bad faith statute does not include a definition of "bad faith," the term encompasses a wide variety of objectionable conduct, as described by a panel of this Court in *Brown:*

For example, bad faith exists where "the insurer did not have a reasonable basis for denying benefits under the policy and that the insurer knew of or recklessly disregarded its lack of reasonable basis in denying the claim." *O'Donnell v. Allstate Ins. Co.,* 734 A.2d 901, 906 (Pa.Super.1999) ...; *see also, Terletsky v. Prudential Prop. And Cas. Ins. Co.,* 437 Pa.Super. 108, 649 A.2d 680, 688 (1994) (bad faith is a frivolous or unfounded refusal to pay the proceeds of a policy done with dishonest purpose, motivated by self-interest or ill will). Bad faith conduct also includes "lack of good faith investigation into facts, and failure to communicate with the claimant." [*Romano v. Nationwide Mut. Fire Ins. Co.,* 435 Pa.Super. 545, 646 A.2d 1228,

1232 (1994) ]; *see also, Birth Center,* 787 A.2d at 378 (upholding a finding of bad faith where the insurer intransigently refused to settle a claim that could have been settled within policy limits, where the insurer lacked a bona fide belief that it had a good possibility of winning at trial, thus resulting in a large damage award at trial); *O'Donnell,* 734 A.2d at 906 (bad faith "may also extend to the insurer's investigative practices").

Recently, in *Hollock v. Erie Ins. Exch.,* 842 A.2d 409 (Pa.Super.2004) (*en banc*), this Court upheld a trial court's finding of bad faith where well-documented evidence at trial established that the insurer misrepresented the amount of coverage, arbitrarily refused to accept evidence of causation, secretly placed the insured under surveillance, acted in a dilatory manner, and forced the insured into arbitration by presenting an arbitrary "low-ball" offer which bore no reasonable relationship to the insured's reasonable medical expenses, and which proved to be 29 times lower than the eventual arbitration award.

On the other hand, our Courts have not recognized bad faith where the insurer makes a low but reasonable estimate of the insured's losses, or where the insurer made a reasonable legal conclusion based on an area of the law that is uncertain or in flux. *Terletsky,* 649 A.2d at 688–689; *see also, O'Donnell,* 734 A.2d at 910 (in the absence of evidence of a dishonest purpose or ill-will, it is not bad faith to take a stand with a reasonable basis or to "aggressively investigate and protect its interests" in the normal course of litigation).

To constitute bad faith, it is not necessary that the insurer's conduct be fraudulent. However, mere negligence or bad judgment is not bad faith. To support a finding of bad faith, the insurer's conduct must be such as to "import a dishonest purpose." In other words, the plaintiff must show that the insurer breached its duty of good faith through some motive of self-interest or ill-will. Bad faith must be shown by clear and convincing evidence.

*Brown,* 860 A.2d at 500–501 (some internal citations omitted). To prove bad faith, a plaintiff must show by clear and convincing evidence that the insurer (1) did not have a reasonable basis for denying benefits under the policy and (2) knew or recklessly disregarded its lack of a reasonable basis in denying the claim. *Terletsky v. Prudential Property and Casualty Insurance Company,* 437 Pa.Super. 108, 649 A.2d, 680, 688 (1999). Bad faith claims are fact specific and depend on the conduct of the insurer *vis à vis* the insured. *Williams v. Nationwide Mutual Ins. Co.,* 750 A.2d 881, 887 (Pa.Super.2000).

■ ¶ 15 As a preliminary matter, we will address Erie's assertion that the trial court imposed a heightened duty of good faith because this UIM claim was a first party matter as opposed to a third party matter. Erie Brief at 33. Erie contends, and we agree, that no legal authority exists for the proposition that an insurer has a heightened duty of good faith to its insured in the context of a first party claim, as opposed to a third party claim. The instant case, however, involves a third category of claims, uninsured and UIM claims (collectively U-claims). The question arises, then, what is an insurer's duty to its insured in the context of U-claims?

¶ 16 To address that question, a clear understanding of U-claims is necessary. In its *amicus curiae* brief, the Pennsylvania Defense Institute (PDI) provides an apt description of U-claims.

U-claims are not purely first party claims. Nor are they purely third party claims. Instead, U-claims are hybrid claims that involve elements of both first party claims and third party claims.

U-claims do undeniably have certain components found in first party claims. They are like first party claims in that the insured claimant is often, but not always, making a direct claim against his own insurer under his own policy, under a now optional coverage he elected and for which he paid a premium. While a good number of U-claims are made by insureds against their own insurer under their own policy, "U" coverage also traditionally extends to passengers or even pedestrians who are strangers to the policy. U-claims are also akin to first party claims insofar as the disclosure of policies and coverage terms are concerned. There is no argument but that insurers are obligated to respond for requests for policy information and similar coverage information consistent with the general contractual duties of good faith and fair dealing and the specific statutory provisions which govern such disclosure. Beyond those threshold connections and duties, however, and when it turns to issues such as liability, damages, coverage, or even procedure, U-claims become very much like third party claims. Simply stated, they are inherently and unavoidably arm's length and adversarial.

U-claims are like third party claims because the contract of insurance sets them up that way. The traditional insuring agreement contained in the Uninsured and/or Underinsured Motorist section of the policy provides that the insurer agrees to pay to the insured the amount that the insured would otherwise be legally entitled to recover from the owner or operator of an uninsured or underinsured motor vehicle. Under that insuring agreement, the amount of the benefits the insured is entitled to recover from the insurer is measured by the third party tort recovery the insured would have been entitled to from the tortfeasor if that tortfeasor had his own liability coverage (for uninsured motorist claims) or had enough such coverage (for underinsured motorist claims).

U-claims are like third party claims because the insured is naturally and inherently seeking to maximize his recovery of general damages, while the insurer seeks, within reasonable limits, to minimize that recovery. U-claims bear another similarity to third party claims insofar as each side is entitled, but not required, to have legal counsel, charged with the role and responsibility of advocating the interest of his or her client.

U-claims are also like third party claims in the practical sense of the presentation of issues and positions which can arise in the claim...

Indeed, under the arbitration provisions which the legislature requires to be included in "U" coverages, that arbitration process itself is arm's length and inherently adversarial in nature, much more akin to a third party claim than a pure first party claim. *See*, e.g., 42 Pa. C.S.A. [§ ] § 7301–7320 ... Undeniably, then, in those instances in which a U-claim does not settle and one or both of the parties invokes the arbitration process statutorily mandated for these ["U"] coverages, the claims are arm's length and adversarial.

PDI *Amicus Curiae* Brief at 7–8 (footnote omitted). *See also, Bonenberger,* 791 A.2d at 381 (recognizing that a UIM claim has both first party and third party components). Armed with this information, we turn to the question of an insurer's duty in the context of a U-claim.

 ¶ 17 Pennsylvania law holds insurers to a duty of good faith and fair dealing toward their insureds, *O'Donnell,* 734 A.2d at 905; *Bonenberger,* 791 A.2d at 381, without distinguishing between first party and third party settings. As described above, U-claims contain elements

of both first party and third party claims. We see no reason, therefore, to impose a different duty on an insurance company in a U-claim setting. While the legal relationship of the parties may change in the context of a U-claim, *i.e.*, become adversarial, the insurer's duty does not change. We hold that, when faced with a U-claim, an insurance company's duty to its insured is one of good faith and fair dealing. It goes without saying that this duty does not allow an insurer to protect its own interests at the expense of its insured's interests. Nor does it require an insurer to sacrifice its own interests by blindly paying each and every claim submitted by an insured in order to avoid a bad faith lawsuit.

¶ 18 In the context of the instant UIM claim, therefore, Erie did not have a *heightened* duty toward the Estate. As with every insurer, Erie's duty was to act in good faith and fair dealing toward its insured. Because the Estate was required to prove its legal entitlement to UIM coverage, Erie was not obligated to pay the Estate's claim on demand, no questions asked. While Erie could take a stand and protect its interests in the normal course of litigation, *O'Donnell*, 734 A.2d at 910, it could not withhold payment of the UIM claim absent a reasonable basis for doing so. *Terletsky, supra.*

¶ 19 Having determined what Erie's duty was to the Estate in the underlying UIM case, we must also address whether Erie breached that duty by engaging in bad faith conduct during its handling of the Estate's UIM claim. However, we are faced with a request from the *amici curiae* to articulate a clear and objective standard for determining what conduct constitutes bad faith in the handling of UIM claims. This Court has already set forth a standard against which to measure the conduct of an insurance company: whether the insurance company had

a reasonable basis for its position or acted in reckless disregard of the absence of a reasonable basis. *Terletsky*, 649 A.2d at 688. As pointed out by the Pennsylvania Trial Lawyer's Association (PaTLA) in its *amicus curiae* brief, the section 8371 good faith duty is an ongoing vital obligation during the entire management of the claim. PaTLA *Amicus Curiae* Brief at 11, 12. Once an insurer identifies a reasonable foundation for denying a claim, it is not relieved of its duty of good faith and fair dealing. *Id.* at 11. In other words, if evidence arises that discredits the insurer's reasonable basis, the insurer's duty of good faith and fair dealing requires it to reconsider its position and act accordingly, all the while remaining "committed to engage in good faith with its insured." *Bonenberger*, 791 A.2d at 381.

¶ 20 Using these principles to evaluate the conduct of an insurer in a UIM claim setting, we turn to the instant case. The trial court set forth fifty-four "findings of fact," many of which are just recitations or summations of testimony, without credibility determinations. What follows is a summary of those findings critical to our analysis.

¶ 21 The first notice to Erie as to any possible claim was a letter from Attorney Hessley dated October 28, 1992, approximately 18 months after the accident. Ronald Habursky (Habursky), Litigation Specialist for Erie, to whom Attorney Hessley's letter was directed, elected to take no action upon the letter because of the terminology used by Mr. Hessley, "potential for the underinsured/uninsured claim." There was no further communication between the parties or activity on the claim until April 12, 1993, when Attorney Hessley wrote again to Erie, asking Erie to concede that Sailar could not recover under her mother's insurance policy and informing Erie that the litigation had pro-

gressed to the point where the identity of the driver would be arbitrated but that the Estate believed Sailar was the driver. Trial Court Opinion, 1/12/04, at 3 (findings of fact 10–12).

¶ 22 On April 6, 1993, Erie's claims adjuster Craig Tidrick (Tidrick) was assigned to investigate the Estate's claim and was forwarded Mr. Hessley's letter of April 12, 1993, which he received on April 13, 1993. That same day, Tidrick wrote to his immediate supervisor, requesting that the police report be obtained. Between April 13 and April 29, Tidrick conducted an investigation by reviewing the Pennsylvania State Police accident report. He did nothing further and made no further inquiries or investigation. No other agents or employees of Erie investigated the matter any further than Tidrick having reviewed the police report. Trial Court Opinion, 1/12/04, at 3–4 (findings of fact 14–16).

¶ 23 On April 14, 1993, Habursky responded to Mr. Hessley by letter, (1) stating that he had contacted Attorney Ron Slater to request copies of the depositions of Sailar and her mother, (2) requesting that Mr. Hessley send him a copy of Breen's policy with Lumberman's, and (3) stating that he would review the file and answer Mr. Hessley's request. *Id.* at 3 (finding of fact 13). Attorney Hessley then wrote to Habursky on April 19, 1993, notifying Erie that the claims against Lumberman's Insurance had been resolved because Lumberman's decided to pay the Estate and Sailar $15,000.00 each rather than expend funds to defend those cases. Hessley requested that Erie waive its subrogation rights and agree to the Estate's settlement with Lumberman's. *Id.* at 3 (finding of fact 18).

¶ 24 On April 29, 1993, Tidrick wrote a letter to Attorney Hessley after reviewing the information he had received from the police report. Tidrick stated, "there are certainly very serious doubts to the claim

that Darby Breen was a passenger in his own vehicle" and "At this time, Erie Insurance, therefore, takes the position that Darby K. Breen was the operator of his own vehicle ... and is not entitled to recover any benefits under his parents' Underinsured Motorists coverages." Trial Court Opinion, 1/12/04, at 4 (finding of fact 17).

¶ 25 On May 7, 1993, Habursky responded to Attorney Hessley's letter of April 19, 1993, explaining that Erie does not subrogate UIM payments. On May 20, 1993, Attorney Hessley wrote a letter to Tidrick's attention, making a claim for uninsured/underinsured benefits due Darby K. Breen, demanding arbitration, and naming the Estate's arbitrator. One week later, Habursky sent the Estate's file to outside counsel, Attorney Craig Murphy, who would handle the case to its conclusion. *Id.* (findings of fact 18, 19, 21).

¶ 26 Through 1993, Erie and Attorney Murphy corresponded about whether the driver exclusion in Mrs. Johnson's policy could preclude the Estate's claim for UIM coverage. The law was then in a state of flux. Attorney Murphy contended that Erie should pursue its defense based on the driver exclusion; he changed his mind just before the arbitration in May 1996. *Id.* (finding of fact 23).

¶ 27 The parties to this lawsuit had been expecting a judicial determination as to the identity of the driver in the claim against Lumberman's Insurance and the Sailar lawsuit against the Estate. When those lawsuits settled in April of 1993, it became clear that there would be no easy resolution of the major question involved in all the lawsuits and claims: the identity of the driver. Despite this, Erie took no action to make any investigation whatsoever but again waited for an arbitration of the Estate's claim against Erie. Trial

Court Opinion, 1/12/04, at 5 (finding of fact 24).

¶ 28 On October 3, 1995, Attorney Hessley sent a settlement demand to Erie for the policy limits of $200,000.00; he warned Erie of its duty of good faith to Breen and stated his intention to proceed to arbitration and then to pursue a bad faith claim. In response to the Estate's demand, Attorney Murphy wrote to Habursky on October 6, 1995, informing Erie of his inclination to tell the Estate a settlement could not be reached because Erie did not believe Sailar was the driver. Attorney Murphy also discussed the appointment of a neutral arbitrator. In a file note dated October 17, 1995, Habursky stated, "[Attorney Murphy] and I agree that there is enough question on who was the operator that we are not in bad faith by arbitrating the claim. [Attorney Murphy] will write to Attorney Hessley and advise him we are not going to make a settlement offer ..." *Id.* at 6 (findings of fact 26–28).

¶ 29 Through various letters during 1995 and 1996, Erie and Attorney Murphy discussed the possibility of using Dr. Lyons, an orthopedic surgeon and engineer, as an expert witness. Dr. Lyons had indicated that Sailar's injuries were not compatible with her position in the car as the driver. Trial Court Opinion, 1/12/04, at 6 *(finding of fact 29)*.

¶ 30 The parties could not agree on a neutral arbitrator because Erie wanted an attorney with experience in insurance law from both the plaintiff and defense point of view and did not consider any attorney from Warren County as meeting that qualification. On December 5, 1995, Judge Millin selected a neutral arbitrator, Attorney Aranyos, the first name on the list of arbitrators that he had received. Erie's counsel requested that Judge Millin appoint Attorney Crosby instead. As evidenced by a letter dated December 5, 1995, from Attorney Murphy to Habursky,

Erie chose Attorney Crosby over Attorney Aranyos, because of Crosby's good relationship with Attorney Murphy's firm. There is no evidence that Habursky directed Attorney Murphy to seek an arbitrator who had experience rather than who might favor his firm. *Id.* at 6–7 (finding of fact 30).

¶ 31 As of December 27, 1995, neither Erie nor Attorney Murphy had contacted Sailar. In a memo of that date, Attorney Murphy's paralegal advised him of the pre-hearing conference date so that Attorney Murphy could confirm the availability of Sailar and Blythe. Attorney Murphy had not contacted either witness before that time. The first letters to Sailar and Blythe were dated January 19, 1996. On January 31, 1996, Attorney Murphy informed his paralegal that both witnesses were reluctant to testify and might not be available. Trial Court Opinion, 1/12/04, at 7 (finding of fact 31).

¶ 32 In a memo to his paralegal dated April 17, 1996, Attorney Murphy advised his paralegal that Sailar and Blythe needed to be contacted so their depositions could be scheduled. This was the first that he spoke of taking depositions of either witness on Erie's behalf. On May 3, 1996, in a letter to Sailar, and on May 9, 1996, in a letter to Blythe, Attorney Murphy's paralegal tried to obtain their testimony. *Id.* (finding of fact 32).

¶ 33 Attorney Murphy had received deposition transcripts from Attorney Slater (Allstate's counsel) on May 6, 1995. Those depositions were of Sailar and her mother, Blythe, two fire fighters, a deputy coroner, two state troopers, the fire chief, the dispatcher, and a female friend of Breen. These depositions remained in a box in Attorney Murphy's office unread, except for those of the Sailars. Habursky mentioned several times to Attorney Murphy that he should read the transcripts. At-

torney Murphy had other matters more pressing and did not read them for an unspecified number of months. *Id.* (finding of fact 33).

¶ 34 In addition to the foregoing, we infer from the trial court's opinion that it disapproved of a statement made by Habursky about Attorney Hessley and of Erie's position regarding who was responsible for advancing the Estate's claim. *Id.* (findings of fact 20, 22, 25, and 38). We also infer that the trial court was impressed with the testimony of the Estate's expert, Barbara Sciotti. According to Ms. Sciotti, an insurance company must try to protect its insured and assist the insured in obtaining the benefits due under the policy in a first party claim context. Trial Court Opinion, 1/12/04, at 9 (finding of fact 43). On a first party claim, an insurance company must act thoroughly and quickly while the evidence is fresh. In the case of a death claim, the sense of urgency is great because the exposure is greater. *Id.* (finding of fact 44). In the instant case, Ms. Sciotti opined, the police report was not clear as to who was driving, so Erie should have continued its investigation in an attempt to answer that question, not leave its investigation to an attorney. *Id.* (finding of fact 46).

¶ 35 The trial court analyzed the above facts as follows:

In the case *sub judice,* the Court finds that [the Estate] presented clear and convincing evidence that [Erie] lacked a reasonable basis for denying [the UIM] claim on April 29, 1993 without conducting a thorough investigation, when there existed a body of conflicting evidence regarding the identity of the driver. Specifically, [Erie] relied upon the Pennsylvania State Police Report which noted that the emergency personnel determined that Sailar was the driver while the investigating officer determined Breen was the driver, based solely upon

interviews of [Sailar] and [Blythe]. Implied in the duty of good faith is the requirement that the insurer investigate[s] the factual predicates of the claim of liability and not unreasonably persist in defenses that are without foundation in either fact or law... [Erie] did not engage in an objective review process before denying [the Estate's] claim. Instead of interviewing the other occupant of the vehicle, reviewing the coroner's report, or requesting [Breen's] medical records, [Erie] opted to base its decision solely upon the Pennsylvania State Police Report.

\* \* \* \* \* \*

[I]t was inappropriate for [Erie], as an insurer in a first party claim, to rely solely upon the police report in this instance because the police report clearly indicated that the identity of the driver was uncertain. Faced with that information, [Erie] could not, in good faith, determine whether or not [the Estate] had a valid claim.

\* \* \* \* \* \*

Although Erie claims that the April 29 letter was only an interim denial and not final, there is no evidence before the Court that the [Estate] was ever informed by [Erie] that they were withdrawing that denial and on the basis of a full investigation, they were making a final denial.

Trial Court Opinion, 1/12/04, at 12–13, 15. Based on its findings of fact and legal analysis, the trial court rendered the following conclusions of law:

1. [Erie], after being placed on notice of a potential claim by [Attorney Hessley's] letter of October 28, 1992, and thereafter, acted in bad faith in treating [its] insured, the [Estate], as an adversary instead of as a protected person under their policy. However, the

letter of October 28, 1992 was conditional and did not initiate a firm claim or demand. A clear claim was not made until May 20, 1993.

2. [Erie] acted in bad faith in its April 29, 1993 letter (responding to a letter from [the Estate] of April 12, 2003) with a denial after having made no investigation other than having a claims representative read a police report.

3. [Erie] acted in bad faith in making its denial of [the Estate's] claim before having made any investigation into the circumstances of the accident by interviewing witnesses or seeking expert witness consultation in light of the uncertain and inconsistent information concerning the operator of the driver as indicated on the Pennsylvania State Police accident report.

4. [Erie] acted in bad faith in adopting the position that it had the right to remain totally inactive on the claim for a period of years and in exchanging internal memos and memos with its attorney, stating that [Erie] would do nothing until the [Estate] forced it do so through the [Estate's] attorney.

5. [Erie] acted in bad faith in working with its attorney in the matter with the clear purpose of obtaining counsel only to defend its interests at an arbitration. This can be seen by the fact that they knew Attorney Murphy had the file for one year and six months before he reviewed any depositions other than that of the Sailars and that after Mr. Murphy had obtained the other depositions, Ronald Habursky never insisted that they be read for the purpose of determining whether or not to pay the claim. Instead, Mr. Murphy was urged to read them in working up a defense. In the same manner, [Erie] did not press [its] attorney to obtain the expert witness report from a Dr. Lyons until immediately before the arbitration, indicating that their purpose was solely to use it for a defense to the claim and not for an analysis of its validity.

6. [Erie] acted in bad faith in failing to keep its insured informed of the progress being made on [the Estate's] claim.

7. [Erie's] conduct was outrageous because of its reckless indifference to the rights of its insured, the [Estate].

8. The reprehensible nature of [Erie's] conduct is limited. The harm caused was economic rather than physical and did not evince an indifference to or a reckless disregard of the health or safety of others and was not the result of intentional malice, trickery or deceit. The reprehensible nature of [Erie's] acts is also not shown to be a policy of [Erie] but is limited to the facts of this case before the Court.

9. The reprehensible nature of [Erie's] conduct is limited by the fact that even though the arbitrators decided that [Sailar] was the operator of the vehicle, after a review of all the evidence that could have been garnered by [Erie], [Erie] could still have had doubt as to the identity of the driver.

10. [Erie] was not acting in bad faith when it proceeded to arbitration after having compiled all available evidence and after having evaluated that evidence. A reasonable person could have carefully considered all the evidence and formed a belief that [Breen] was the driver of the automobile. Other than the position of the occupants in the vehicle after the accident, all other evidence and a rebuttable presumption point to Breen as being the driver.

11. [The Estate's] attorney is entitled to counsel fees and the [Estate] is entitled to costs of suit.

12. [The Estate] is not entitled to recover counsel fees paid to [its] attorney for the arbitration in that there was a basis for arbitration once all the depo-

sitions and expert witness reports were made known and the question of the [identity] of the operator of the vehicle remained in doubt until resolved by the arbitrators.

13. [The Estate] is entitled to punitive damages because of the outrageous conduct of [Erie] which evinced a reckless indifference to the [Estate's] right to have its insurer investigate its first party claim.

Trial Court Opinion, 1/12/04, at 18–20.

¶ 36 After an exhaustive review of the record, we conclude that certain dispositive factual findings summarized above are either unsupported by the record or do not support a claim of bad faith. Consequently, the trial court's conclusion that the Estate presented clear and convincing evidence that Erie lacked a reasonable basis for denying UIM benefits on April 29, 1993, without conducting a thorough investigation, is erroneous. Dispositive to our analysis are the following factors: (1) the trial court erroneously characterized the April 29, 1993, letter from Tidrick to the Estate as a denial of the Estate's UIM claim; (2) the trial court failed to consider that Erie was not required to pay the UIM claim until the question of its liability became reasonably clear; and (3) the trial court failed to recognize that the Estate's UIM claim was not ripe until all other coverage limits had been exhausted. Our analysis of the findings of facts and conclusions of law follows.

¶ 37 I. The record does not support the trial court's finding that Habursky elected to take no action upon the letter of October 28, 1992, from Attorney Hessley, which was directed to Habursky. Notably, the October 28th letter was sent eighteen months after the accident, during which time other lawsuits were pending. The letter was not addressed to Habursky or any other individual at Erie, but rather to Erie Insurance Group; the greeting read "Dear Gentlemen." See Complaint, 7/10/96, Exhibit 1.

¶ 38 An insurer is required to respond to notice of a claim within ten days. 31 Pa. Admin. Code § 146.5. In this case, however, the letter did not warrant a response from Erie because, as the trial court correctly concluded, "it was conditional and did not initiate a firm claim or demand." Trial Court Opinion, 1/12/04, at 18 (conclusion of law 1). Therefore, Erie cannot have acted in bad faith by not taking action on the letter when it was not required to do so because a claim had not been filed.

¶ 39 II. The record does not support the trial court's finding that there was no further activity on the claim until April 12, 1993, when Attorney Hessley sent a letter to Habursky. In fact, the record supports the trial court's contradictory finding that Erie assigned the matter to Tidrick on April 6, 1993. In addition, the record shows that Attorney Hessley's letter was promptly forwarded to Tidrick, who received it on April 13, 1993. In any event, we reiterate that Erie cannot have acted in bad faith by not taking action when it was not required to do so because a claim had not been filed.

¶ 40 III. The record does not support the trial court's finding that no other agents or employees of Erie investigated the matter any further than Tidrick having reviewed the police report. This finding was responsive to what the trial court characterized as a "clear direction [from the *Condio* panel] ... that in evaluating the evidence at the bench trial [the trial court] would have to look for something more prior to April 29, than a perusal of a Pennsylvania State Police accident report as the extent of the insurance company's investigation of [the Estate's] claim." Trial Court Opinion, 1/12/04, at 14. According to the trial court, "There [was] no

'something more' in the evidence." *Id.* To the contrary, there is something or, rather, someone more in the record. Another Erie employee investigated the Estate's claim beyond the police report. During the period of Tidrick's involvement from April 6th through 29th, Habursky was in contact with Attorney Hessley about (1) the need for arbitration on the question of who was driving, (2) the two Sailar litigations, including Sailar's verified statements that she was the passenger in Breen's car, and (3) Sailar's settlement with Lumberman's Insurance. Based on the information he received, Habursky requested depositions from Allstate's counsel and a copy of the Lumberman's policy from Attorney Hessley.

¶ 41 Even if Erie had relied on just the police report to support its initial position, we believe, under the circumstances of this case, that it would not have acted in bad faith. Consider the corroborative testimony from the Estate's expert, Barbara Sciotti, and Erie's expert, John McLean, Esq., that it is not uncommon for an insurance company to make an initial determination about a claim based on a police report, leaving the claim open to further investigation and evaluation. N.T., 7/31/03, at 59; N.T., 9/23/03, at 193–94. The undisputed evidence in this case, not mentioned by the trial court, indicates that the police report was a "very lengthy" document. N.T., 7/29/03, at 61. It contained the state trooper's initial and supplemental reports (dated 4/13/93 and 4/14/93) and statements by Sailar and Blythe taken two months after the accident. The equivocal contents of the police report raised enough of a question about who was driving—and ultimately Erie's exposure—to provide Erie with a reasonable basis for taking *an initial position*, pending further investigation and evaluation, that the Estate was not entitled to UIM benefits because Breen was driving his own vehicle at the time of the accident.

The additional information learned by Habursky served to bolster that initial position.

¶ 42 IV. The record does not support the trial court's findings that Tidrick's letter of April 29, 1993, was a denial of the Estate's claim. Common sense dictates that a claim cannot be denied until it has been made. A claim is a "demand for payment by a claimant and not an inquiry concerning coverage." 31 Pa. Admin. Code § 146.2(b) (Definitions). "Notification of a claim," whether in writing or other means acceptable under the terms of an insurance policy or insurance contract, to an insurer or its agent, by a claimant or insured, reasonably apprises the insurer of the facts pertinent to a claim. *Id.; see also,* 40 P.S. § 753(A)(5) (Notice of claim: "Written notice of claim must be given to the insurer within twenty days after the occurrence or commencement of any loss covered by the policy, or as soon thereafter as is reasonably possible.").

¶ 43 As stated earlier, the Estate's letter of October 28, 1992, advised Erie of the Sailar litigations and a "potential" UIM claim by the Estate against Erie. Given the above definitions, the Estate had not made a claim as of April 29, 1993; therefore, the April 29th letter was not a denial. As found by the trial court, the Estate did not make a formal claim until May 20, 1993, which finding is supported by the record. (As discussed below, the UIM claim of May 20th was not yet ripe for payment by Erie.) Moreover, nothing in the record suggests that Tidrick's letter was other than a preemptive statement of Erie's position.

¶ 44 Because the April 29th letter was not a denial, the trial court erred in concluding that the Estate presented clear and convincing evidence that Erie lacked a reasonable basis for denying the UIM claim on April 29, 1993, without conducting

a thorough investigation. It was the body of conflicting evidence regarding the identity of the driver that provided Erie with a reasonable basis for taking its initial position of withholding UIM benefits. As found by the trial court, that same body of evidence supported Erie's decision to proceed to arbitration. Trial Court Opinion, 1/12/04, at 19 (conclusion of law 10). Notwithstanding the former *Condio* panel's concern, nothing in the record establishes that Erie's initial position was pretextual; accordingly, the trial court made no such finding.

¶ 45 V. If one views Erie's investigative conduct after April 1993 through the lens of a purely first or third party claim, the record supports the trial court's finding that Erie took no action to make any investigation when it became clear in April 1993, after the Lumberman's settlement, that there would be no easy resolution to the question of who was driving the car. However, one must view Erie's investigative conduct after April 1993 through the lens of a UIM claim. Doing so, we conclude that Erie's investigative conduct did not rise to the level of bad faith under the circumstances of this case. Those circumstances include the pivotal issue of who was driving, the Estate's demand for arbitration, and the exhaustion of coverage provision in the Erie policy.

¶ 46 The Estate notified Erie about the Sailar–Lumberman's settlement in a letter from Attorney Hessley dated April 19, 1993. After that date, Erie did not conduct a thorough independent investigation of the Estate's claim, as it might have if this were strictly a first or third party claim. As of that date, though, Erie was aware of the equivocal police report and the pivotal issue in the Sailar litigations, namely, who was driving Breen's vehicle at the time of the accident. The answer to the driver question determined Erie's exposure. If Breen was the driver, Erie would not be liable for UIM coverage; if Breen was not the driver, Erie would be liable for UIM coverage. Erie was also aware of the Estate's expectation of an arbitration hearing in the Sailar litigations to answer the driver question. Given the pivotal issue of who was driving the car— and ultimately whether Erie would be liable for the "potential" UIM claim—and the Estate's expectation of a judicial determination of that question in the Sailar litigations, we cannot say as a matter of law that Erie acted in bad faith by not pursuing a thorough independent investigation while its exposure remained uncertain.[2]

¶ 47 Based on the information it possessed in April 1993, Erie took a stance on the driver question contrary to the Estate's, thus spawning a dispute between insurer and insured. (Of note, the Estate did not challenge Erie's position until October 3, 1995, when the Estate stated its intention to pursue a bad faith claim should Erie not settle for the policy limits.) The Erie policy provided for resolution of

---

**2.** The dissent concludes: "Had Erie conducted an investigation, it would have discerned, if only by the position of Breen's body in the car, that he had been the passenger, not the driver, and was thereby entitled to coverage." Opinion at 1159. The record establishes that Erie "compiled all available evidence" and "evaluated that evidence," before proceeding to arbitration. Trial Court Opinion, 1/12/04, at 19. In other words, Erie did investigate. Moreover, as the trial court concluded, "A reasonable person could have carefully considered all the evidence and formed a belief that [Breen] was the driver of the automobile." *Id.* Like Erie and the trial court, we do not find resolution of the question of who was driving to be so straightforward and self-evident. The Estate's expert concluded from all the evidence that Sailar had been the driver; a medical doctor with an engineering background retained on behalf of Erie concluded, from his review of all the evidence, just the opposite.

such disputes through UIM arbitration. On May 20, 1993, the Estate confirmed its intention to pursue an arbitration hearing in the Estate's claim against Erie, in addition to waiting for a determination in the pending Sailar–Allstate litigation. Shortly thereafter, Erie closed its internal file and referred the case to Attorney Murphy.

¶ 48 By its very nature, the demand for UIM arbitration immediately cast Erie in an adversarial role *vis à vis* the Estate. Given its position, Erie's management and investigation of the claim would not follow the normal course for investigating a first party claim. Instead, Erie's investigation of the Estate's UIM claim continued in the hands of Attorney Murphy in the context of pursuing arbitration to determine the factual dispute of who was driving. Attorney Murphy gathered and reviewed additional depositions from Attorney Eiben (Sailar's counsel), met with Attorney Eiben, pursued Sailar and Blythe as witnesses, and discussed with Erie the validity of the Estate's claim, the application of existing legal defenses, and the use of Dr. Lyons as an expert witness. Nothing in the record suggests that Attorney Murphy acted independently of Erie or that Erie hid behind its relationship with counsel to avoid its obligations to the Estate. Rather, while Erie worked with Attorney Murphy to analyze the Estate's claim and prepare for the arbitration, Erie made the decisions regarding how to handle the claim and which defenses to present.

¶ 49 Of significance, Attorney Murphy's efforts on Erie's behalf were sufficient enough for the trial court to conclude that "the identity of the driver was a pivotal question throughout the case and provided a reasonable basis for Erie to proceed to arbitration after having compiled and evaluated all available evidence." Trial Court Opinion, 1/12/04, at 19, 20 (findings of fact 10 and 12). "A reasonable person could have carefully considered all the evidence and formed a belief that [Breen] was the driver of the automobile. Other than the position of the occupants in the vehicle after the accident, all other evidence and a rebuttable presumption[3] pointed to Breen as the driver." Trial Court Opinion, 1/12/04, at 19 (conclusion of law 10).

¶ 50 Given the Estate's demand for UIM arbitration and Attorney Murphy's investigative efforts on Erie's behalf, we cannot say as a matter of law that Erie acted in bad faith by not pursuing a thorough independent investigation. Nor can we agree with the trial court that Erie acted in bad faith by treating the insured as an adversary, by working with counsel to defend its interests at an arbitration hearing, and by failing to keep its insured informed of progress being made on the claim. Trial Court Opinion, 1/12/04, at 18 (conclusions of law 1, 5, and 6). As discussed above, UIM claims are inherently arm's length and adversarial. Both Erie and the Estate were entitled to employ counsel to act on their behalf in protecting their interests. As for keeping the Estate informed, an insurance company has a regulatory obligation to respond to pertinent communications from an insured. 31 Pa. Admin. Code § 146.5. That regulation does not require an insurer to initiate communications regarding the status of an insured's claim.

---

**3.** This presumption is found in 42 Pa.C.S.A. section 6143(a), which reads: "In any action or proceeding for the recovery of a civil penalty for an infraction of the provisions of any law relating to the ownership or operation of any conveyance by air, land or water or any game or fish law or any local ordinance, rule or regulation relating thereto, the registration number displayed on a conveyance shall sustain any inference that the person to whom the registration number was officially assigned is the owner of the conveyance and was then operating the conveyance."

¶ 51 Lastly, the Estate's claim for UIM benefits was conditioned by an exhaustion of coverage provision in the Erie policy.[4] This provision required the Estate to pursue all other limits of insurance coverage before seeking UIM benefits from Erie. (We note the trial court made no mention of this provision or its impact on Erie's liability to the Estate.) Lumberman's coverage was exhausted in April 1993, when Lumberman's paid $15,000.00 each to Sailar and the Estate. However, as of the Estate's claim and arbitration demand on May 20, 1993, the Sailar–Allstate litigation was still pending.[5] As a matter of then-existing law, therefore, the Estate's UIM claim against Erie would not ripen, thereby exposing Erie to liability for UIM coverage, until October 1994 when the Sailar–Allstate litigation ended.

¶ 52 However, come October 1994, Erie's exposure was still not crystallized. It is undisputed that Attorney Hessley did not become aware of the Sailar–Allstate disposition until almost a year later, in August 1995. Having heard nothing from the Estate since May 20, 1993, Erie only learned of the outcome of the Sailar–Allstate case in a letter dated September 14, 1995, from Attorney Hessley to the person he, incorrectly, believed was the neutral arbitrator. Eventually, on October 3, 1995, having exhausted all other insurance limits and having notified Erie to that effect, Attorney Hessley sent to Erie and Attorney Murphy a letter stating, "You should consider this letter a formal demand for the settlement of the underinsurance claim for $200,000.00." Complaint, 7/10/96, Exhibit I.

¶ 53 Given the Estate's UIM claim was not ripe until October 1994 and Erie was not aware that all other coverage limits had been exhausted until October 1995, we cannot say as a matter of law that Erie acted in bad faith by not pursuing a more thorough independent investigation.

¶ 54 In light of the driver issue, the Estate's demand for arbitration, and the outstanding Allstate coverage, all of which raised a question of Erie's exposure, we conclude that Erie's investigative conduct from April 13, 1993, through October 3, 1995, does not support the Estate's bad faith claim. While the Estate and the trial court required more of an investigation from Erie, we conclude that, under the circumstances of this case, a thorough independent investigation by Erie would have been premature to its exposure, redundant to Attorney Murphy's efforts in preparing for arbitration, and duplicative of the investigations undertaken by the state trooper and in the Sailar litigations during the eighteen month interval between the accident and the Estate's first notice to Erie in October 1992.

¶ 55 In conclusion, we hold that the trial court erred in concluding that Erie acted in bad faith by denying benefits without making a more thorough investigation. As stated above, the letter of April 29th was not a denial, and Erie's investigation included more than Tidrick reading the police report; it also included Habursky's and Attorney Murphy's work product. Moreover, Erie's failure to pursue an independent investigation did not amount to bad faith because the driver question was

---

4. The law regarding enforceability of such clauses has since changed. *See Boyle v. Erie Insurance Company,* 441 Pa.Super. 103, 656 A.2d 941 (1995). This change in the law, however, occurred after the Sailar–Allstate litigation ended in October 1994.

5. The Sailar–Allstate litigation did not end until October 26, 1994, when the arbitration panel determined that Sailar was not a resident of her mother's household, leaving unanswered the question of who was driving Breen's car at the time of the accident.

unanswered, arbitration was demanded, and the UIM claim was not ripe.

¶ 56 We are left with several additional trial court findings and conclusions that warrant comment. First, while the record supports the trial court's finding that Erie chose a neutral arbitrator based on his relationship with Attorney Murphy's firm, Trial Court Opinion, 1/12/04, at 6–7 (finding of fact 30), Erie's conduct does not rise to the level of bad faith. Because the parties could not agree on a neutral arbitrator, the trial court was responsible for selecting one. The trial court chose the first name on a list of three Warren County attorneys submitted by the Estate. Surprisingly, the trial court then allowed Erie to choose a different attorney. Even so, the trial court's decision to abdicate its responsibility in Erie's favor does not amount to bad faith on Erie's part. We cannot fault Erie for taking advantage of the trial court's goodwill gesture by choosing a familiar name, when its request for an out-of-county attorney had been rejected. Moreover, the Estate's objection is weakened by the fact it recommended the attorney Erie chose.

¶ 57 Second, although the record supports the trial court's findings about Attorney Murphy's efforts to secure the testimony of Sailar and Blythe for the arbitration hearing, Trial Court Opinion, 1/12/04, at 7 (findings of fact 31, 32), nothing in the record suggests that counsel's conduct was attributable to Erie. Moreover, the fact that Attorney Murphy waited to secure Sailar's and Blythe's live testimony or to take new depositions for use at the arbitration hearing was not without reason. Erie's exposure remained uncertain from October 1992 (notice of potential claim) until October 1995 (notice of Sailar–Allstate outcome), during which time the Estate pursued other coverage limits and a judicial determination as to who was driving.

¶ 58 Third, the record supports the trial court's finding that depositions sat in a box in Attorney Murphy's office unread by him for an unspecified number of months beginning in May 1995 and that Habursky had to remind counsel of their presence. *Id.* (finding of fact 33). However, even if Attorney Murphy had more pressing matters, nothing in the record suggests that counsel's procrastination was attributable to Erie. (From August 1994 through August 1995, Attorney Hessley himself had a matter more pressing than the Estate's UIM claim against Erie, namely, a judicial campaign. *See* Erie Trial Exhibits 61 and 66.) In fact, Erie's reminders to counsel indicate its active involvement in the case.

¶ 59 Fourth, the record supports the trial court's finding that Habursky made a critical statement about Attorney Hessley. Trial Court Opinion, 1/12/04, at 4 (finding of fact 20). While this statement was unprofessional and regrettable, it did not rise to the level of bad faith. As for the trial court's findings that Erie took the position it could wait for the Estate to move the case forward, *id.* at 4, 18 (findings of fact 22, 25 and conclusion of law 4), it is well-established that a plaintiff has the burden of advancing its case. *See Independent Technical Services v. Campo's Exp., Inc.,* 812 A.2d 1238, 1240 (Pa.Super.2002) (citing Pa.R.J.A.1901: "The plaintiff in a case has an affirmative duty to move its case forward."). Finally, the trial court used an incorrect standard for bad faith in describing Erie's conduct as "outrageous because of its reckless indifference to the rights of its insured" and "reprehensible." *Id.* (conclusions of law 7 and 9).

¶ 60 Because the Estate did not present clear and convincing evidence that Erie acted in bad faith under the circumstance of this case, the trial court erred in entering judgment in favor of the Estate.

Therefore, we vacate the decision of the trial court and remand for the entry of judgment nov in favor of Erie. As a result of our disposition, we need not address Erie's remaining issues or the Estate's appeal.

¶ 61 Judgment vacated. Case remanded for entry of judgment notwithstanding the verdict in favor of Erie. Jurisdiction relinquished.

¶ 62 JOHNSON, J. files a Dissenting Opinion.

## DISSENTING OPINION BY JOHNSON, J.:

¶ 1 I respectfully dissent. In this case, the Majority would allow Erie Insurance Exchange and Erie Insurance Group (collectively "Erie") to avoid liability under Pennsylvania's bad faith statute by effectively narrowing the scope of the insurers' duty to first party UM/UIM claimants. Reasoning that such claims are similar to third-party claims, the Majority adopts the assertion of *amicus curiae*, the Pennsylvania Defense Institute, that such "U-claims" are "inherently and unavoidably arm's length and adversarial." Op. at 1144. I reject this conclusion as an unwarranted diminution of the duty of good faith due to all Pennsylvania policyholders who seek benefits from their own insurer, notwithstanding the nature of the claim. Such apparent vitiation of the insurer's duty, with its concurrent license of the sort of pretextual denial of coverage evident in this case, is far beyond the contemplation of current caselaw.

¶ 2 I object further to the Majority's assertion that notwithstanding the duty applied, Erie need have tendered no more than the nominal "investigation" it now defends because other factors in the case rendered a thorough investigation premature, redundant, and duplicative. *See* Op. at 1154. The stark reality of this case is that had Erie conducted even a cursory investigation it would have recognized (as did the trial court), the dubious nature of the police report on which it relied. It could also have spared its insured (who died during the pendency of this litigation) the delay and expense of an unnecessary arbitration. Accordingly, I concur in the trial court's conclusion that Erie acted in bad faith and I would affirm its judgment.

¶ 3 Pennsylvania's bad faith statute, 42 Pa.C.S. § 8371, offers no definition of "bad faith toward the insured." Consequently, we have articulated circumstances in which bad faith claims may be brought, suggesting that "bad faith" is equivalent to a breach of the carrier's obligation to act in good faith. *See Zimmerman v. Harleysville Mut. Ins. Co.*, 860 A.2d 167, 172 (Pa.Super.2004) ("The breach of the obligation to act in good faith cannot be precisely defined in all circumstances, however, examples of 'bad faith' conduct include: 'evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.' ").

¶ 4 "The duty of an insurer to act in good faith 'arises because the insurance company assumes a fiduciary status by virtue of the policy's provisions which give the insurer the right to handle claims and control settlement.' " *Brown v. Progressive Ins. Co.*, 860 A.2d 493, 500 (Pa.Super.2004) (quoting *Romano v. Nationwide Mut. Fire Ins. Co.*, 435 Pa.Super. 545, 646 A.2d 1228, 1231 (1994)). This duty applies to all instances in which an insured makes a first-party claim, including UM/UIM claims, subject to limited exceptions. Accordingly, our courts have recognized that the valuation of UIM claims "may follow traditional third party claimant concepts." *Bonenberger v. Nationwide Mut. Ins. Co.*, 791 A.2d 378, 381 (Pa.Super.2002).

¶ 5 That is not to say, however, that such concepts apply to every aspect of the case. In practical terms, this standard only allows the insurer to contest the insured's valuation; the insured's demand must continue to be treated as a first-party claim. *See Brown*, 860 A.2d at 500 ("An individual making a UIM claim is making a first party claim, however the valuation of that claim may follow traditional third party claimant concepts[.]"). Thus, while insurer and insured may assert, and defend, competing positions on the value of the claim, the carrier remains bound by a duty of good faith. *See Bonenberger*, 791 A.2d at 381. Accordingly, its decision on valuation, and by extension its denial of the claim, may be made *only after a conscientious investigation of each matter on a case-by-case basis. See id.* at 382; *see also Brown*, 860 A.2d at 500 (quoting *Romano*, 646 A.2d at 1232) (recognizing that "[b]ad faith conduct also includes 'lack of good faith investigation into fact[s]' ".).

¶ 6 Our reasoning in *Bonenberger*, a case decided on a claim for UIM benefits, confirms this conclusion as a bedrock principle that binds every carrier and every court in the disposition of every "U-claim:"

Individuals expect that their insurers will treat them fairly and *properly evaluate any claim they may make.* A claim must be evaluated on its merits alone, by examining the particular situation and the injury for which recovery is sought. An insurance company may not look to its own economic considerations, seek to limit its potential liability, and operate in a fashion designed to "send a message." Rather, it has a duty to compensate its insureds for the fair value of their injuries. Individuals make payments to insurance carriers to be insured in the event coverage is needed. It is the responsibility of insurers to treat their insureds fairly and provide just compensation for covered claims based on the actual damages suffered.

Insurers do a terrible disservice to their insureds when they fail to evaluate each individual case in terms of the situation presented and the individual affected. *Bonenberger*, 791 A.2d at 382 (emphasis added). Thus, the duty imposed on the insurer to investigate does not change merely because the claim at issue seeks UM/UIM coverage. Nor does the realignment of the parties' interests accompanying a "U-claim" alter the parties' relationship in the manner the Majority supposes. Simply stated, "U-claims" are not "inherently and unavoidably arm's length and adversarial," *see* Op. at 1144, and have never been so recognized by the caselaw that properly controls our disposition. Consequently, no carrier may deny its insured's UIM claim on a pretext or fail to conduct a plausible investigation because evidence otherwise available, although limited, ostensibly supports denying the claim, *See Brown*, 860 A.2d at 501 (quoting *Romano*, 646 A.2d at 1232). In short "U-claimants" may not be treated as adversaries in any aspect of the case other than the valuation of the claim. This standard does not impose a "heightened duty," but is merely an affirmation of the one recognized by our cases.

¶ 7 Significantly, the Majority's analysis of the duty standard, as advocated by *amicus, see* Pennsylvania Defense Institute *Amicus* Brief at 7–8, shortchanges this "first-party" duty, limiting its application to "threshold connections" and denying its effect on "liability, damages, coverage, or even procedure[.]" *See* Op. at 1144. Although the Majority asserts that its decision does not "impose a different duty on an insurance company in a U-claim setting," Op. at 1145, the result it espouses does precisely that. Indeed, it appears to excuse insurers fielding UIM claims from any serious obligation to investigate, requiring the insured to shoulder the burden of proof to show liability. *See* Op. at 1150

(concluding that "the trial court failed to consider that Erie was not required to pay the UIM claim until the question of its liability became reasonably clear"). Thus, the Majority would apply a measure of duty appropriate only for third-party claims and *valuation* of "U-claims" to the initial assessment of those claims. The Majority cites none of our prior decisions to support so substantial a limitation of the insurer's duty to UIM claimants, and by my reckoning, no such decision exists. In point of fact, its premise appears to contravene our prior caselaw which, as I have noted, acknowledges the similarity of third-party claims and UM/UIM claims only for purposes of valuation. *See Brown*, 860 A.2d at 500; *Bonenberger*, 791 A.2d at 381. Nevertheless, relying upon the decision the Majority now renders, Erie and any other carrier so determined might dismiss UM/UIM claims out of hand, merely because some kernel of information readily available, (in this case, a facially dubious police report), provides the needed cover. The trial court recognized that such an approach is fundamentally at odds with the duty owed to first-party claimants and I concur in its conclusion. *See* Trial Court Opinion, 1/12/04, at 13 ("[I]t was inappropriate for [Erie], as an insurer in a first party claim, to rely solely upon the police report in this instance because the police report clearly indicated that the identity of the driver was uncertain. Faced with that information, [Erie] could not, in good faith, determine whether or not [the Estate] had a valid claim.").

¶ 8 When adjudged by a first-party duty standard, Erie's "investigation" was woefully inadequate. That standard, which we reaffirmed upon reversing the trial court's entry of summary judgment in favor of Erie, imposes responsibility upon the insurer to conduct an investigation sufficient to make an informed and measured assessment of liability without reference to valuation:

An insurer cannot meet its obligation to its insured by stating a pretextual reason for denying a claim in the hope that the insured will forego litigation or a subsequent investigation in preparation for the litigation will find support for the pretextually stated reason. *An insured should not be compelled to litigate a claim without the insurer first conducting a prompt and full investigation* and the objective evaluation of the claim that reveals a reasonable basis for denial. Insurers have an implied duty to promptly and fully respond to their insured to investigate the claim and engage in an objective review process. *This duty necessarily places the responsibility upon the insurer to assemble all the facts necessary for a fair and comprehensive investigation* before it denies a claim, and it may not base a defense to a bad faith assertion by relying on later acquired information.

*Condio v. Erie Ins. Exch.*, 815 A.2d 1134 (Pa.Super.2002) (unpublished memorandum) (Slip Op. at 18) (emphasis added).

¶ 9 Thus, the Majority's characterization notwithstanding, what actions Erie employees took in response to the Estate's claim do not constitute an investigation as we, and the trial court, understood that term on remand following our reversal of the trial court's grant of summary judgment. *See* Slip Op. at 27 ("Another Erie employee investigated the Estate's claim beyond the police report. During the period of Tidrick's involvement from April 6th through 29th, [Erie claims representative] Habursky was in contact with [Plaintiff's counsel] about (1) the need for arbitration on the question of who was driving, (2) the two Sailar litigations, including Sailar's verified statements that she was the passenger in Breen's car, and (3) Sailar's settlement with Lumberman's Insurance."). None of these acts operated to assemble

the facts underlying Breen's fatal accident. Indeed, each evinces a "wait and see" attitude, anticipating that other litigation or the arbitration itself might ameliorate Erie's exposure and make even a cursory investigation unnecessary. Had Erie conducted an investigation, it would have discerned, if only by the position of Breen's body in the car, that he had been the passenger, not the driver, and was thereby entitled to coverage. Breen died of injuries sustained when his car careened down an embankment, colliding with a tree. First responders at the scene found Breen in the front *passenger* seat, the car's mangled footwell entrapping his legs beneath the dashboard on *that side* of the car and his head resting against a tree that had intruded into *that side* of the car. Further examination showed that Breen had suffered a fracture of the skull in the area above his right ear, ostensibly *where his head had struck the tree*. Breen's companion, Karen Sailar, survived the accident but attested almost no recollection of the incident. When medics removed her from the car, her upper body was lying *over Breen's* on the right side of the car with her legs extending to the left *into the driver's-side footwell.*

¶ 10 Notwithstanding the availability of this information had Erie chosen to investigate, it relied on the state trooper's report, which did not reach a firm conclusion on the identity of the car's driver. Although in one portion of the report the trooper indicated that Karen Sailar had been driving, the trooper indicated elsewhere that he was not sure who was driving. Nevertheless, the trooper further noted that the seatbelts had been cut when he arrived at the scene, thus suggesting that Sailar and Breen had been using them and were found by the medics strapped into their respective seats. If anything, the report thus suggested that Breen was not driving, entitling his estate to UIM coverage, yet Erie relied on its uncertainty to delay the claim in favor of taking a chance on arbitration. Although the arbitration panel ultimately found for the Estate, the delay incumbent in the arbitration process could have been substantially reduced or eliminated had Erie only acted in good faith, treating the Estate's request for coverage as the first party claim it was. Its failure to do so, in my view, runs afoul of its duty to the insured and violates Pennsylvania's bad faith statute. Accordingly, I would affirm the judgment of the trial court. Because the Majority declines this course, I must respectfully dissent.