**Rhodes v. USAA Casualty Insurance Company**

*Richard M. Serbin*, for plaintiffs.
*Patricia A. Monahan*, for defendant

BROWN, *S.J.*, July 18, 2013—

## BACKGROUND

In two Pennsylvania Superior Court decisions the relevant facts and procedural history of this case has been set out: First, in an unpublished memorandum decision, *William J. Rhodes, Jr. and Carrie E. Rhodes, his wife, v. USAA Casualty Insurance Company*, filed on January 31,

2008 (951 A.2d 1225 (Table)(Pa. Super. 2008)(hereafter "Rhodes I") (pp. 2-4); and later in Rhodes v. USAA, 21 A.3d 1253 (Pa. Super. 2011)(hereafter Rhodes II")(pp. 1253-1255). This court is satisfied those recitations of the background of this case is sufficient for its purposes at this point. References will be made to the factual and procedural history as necessary throughout the discussion portion of this opinion.

## DISCUSSION

This case is in an unusual, although not unprecedented, position. As set forth above, it has twice been before the Pennsylvania Superior Court on specific pre-trial issues. In the unpublished memorandum decision, *William J. Rhodes, Jr., and Carrie E. Rhodes, his wife v. USAA Casualty Insurance Company, supra*, the court reversed the trial court's grant of summary judgment in favor of defendant USAA and affirmed the denial of plaintiff Rhodeses's motion for partial summary judgment.

In *Rhodes v. USAA, supra*, the court reversed the trial court's order compelling disclosure of Rhodeses's attorney's files to their insurer, USAA.

These appellate decisions and the orders and opinions of the trial court, not reversed by appellate decisions, represent the law of the case. *See Commonwealth v. Starr*, 664 A.2d 1326 (Pa. 1995). In this regard, the Superior Court's statement at page 1262 of the opinion in Rhodes II is very instructive: "The only issue here is the reasonableness of USAA's settlement offers and whether it acted in bad faith in refusing to meet the Rhodeses's $175,000.00 settlement demand sooner....."

The burden is on Rhodeses to prove their claim that USAA acted in bad faith by clear and convincing evidence. *Adamski v. Allstate Ins. Co.*, 738 A.2d 1033 (Pa. Super. 1999). The burden of proof standard — clear and convincing evidence — applies whether the claim is under 42 Pa. C.S. §8371, "Actions on Insurance Policies," or a contractual common law bad faith claim. *Id.*

Pennsylvania courts use a two-part test in considering bad faith claims under section 8371. Both elements of the test must be proved by clear and convincing evidence. An insured must show (1) the insurer lacked a reasonable bases for denying benefits under the policy; and, (2) the insurer knew or recklessly disregarded its lack of a reasonable basis. *Terletsky v. Prudential Property & Casualty Ins., Co.*, 649 A.2d 680, 688 (Pa. Super. 1994). *See also Condio v. Erie Insurance Exchange*, 899 A.2d 1136, 1145 (Pa. Super 2006).

The statue does not include a definition of "bad faith". As pointed out in Rhodes I, at p. 10, decisional law has established that the term as used in the context of insurance coverage can cover a wide range of objectionable conduct. Black's Law Dictionary 139 (6th ed. 1990) has been quoted in several appellate court decisions. It has been defined as "any frivolous or unfounded refusal to pay proceeds of a policy...it is not necessary that such refusal be fraudulent." *See Bonenberger v. Nationwide Mutual Insurance Company*, 791 A.2d 378, 380 (Pa. Super. 2002). Such conduct imports a dishonest purpose and means breach of a known duty, namely good faith and fair dealing, through some motive of self-interest or ill will. Rhodes I, at p. 10. Mere negligence or bad judgment is not bad faith. *Id.*

The bad faith statute applies to the handling of underinsured motorist claims. *Brown v. Progressive Insurance Company*, 860 A.2d 493 (Pa. Super. 2004).

A reasonable basis is all that is required to defeat a claim of bad faith. *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300 (3d Cir-1995). It is not bad faith for an insurance company to contest a UM/UIM claim. *Condio v. Erie Ins. Exch.*, 899 A.2d 1136 (Pa. Super. 2006). A long period of delay, in and of itself, does not constitute bad faith. *Thomer v. Allstate Insurance Company*, 2011 U.S. Dist. LEXIS 49511 (E.D. Pa., 5/9/11). A delay of 42 months was insufficient to show bad faith in the case of *Mitch's Auto Serv. Ctr. v. State Auto Mut. Ins. Co.*, 2011 U.S. Dist. LEXIS 123119 (E.D. Pa. 10/24/11). Even if an insurer's delay was unreasonable, where there is no evidence to indicate the delay was knowing or reckless, bad faith is not proven. *Id.*

A low, but reasonable offer, is not bad faith where the insurer makes a reasonable estimate of the insured's losses. *Brown v. Progressive Insurance Company supra.*

Focusing on the Superior Court's directive from Rhodes II, at 1262; and the first prong of the two-part test used by Pennsylvania courts, i.e., an insured must show the insurer lacked a reasonable basis for denying benefits (in this case, by not paying plaintiffs' settlement demand sooner), this court will examine the timeline established by the facts.

The initial important date is May 17, 2002, when Rhodeses' attorney, Richard Serbin, Esquire, submitted to USAA their statement of demand (dated May 10, 2002),

wherein they informed the insurance company they placed a value of their claim at $235,000.00, which is in excess of USAA's UIM stacked coverage of $200,000.00, and offered to settle their claim for $175,000.00. By this time, the Rhodeses had received $50,000.00 from State Farm and $15,000.00 from Progressive Insurance Company. On July 10, 2002, USAA offered to settle the claim for $5,000.00. At that time, USAA maintained there was a question of causation for one of Mr. Rhodes's injuries, specifically a neck injury. The Rhodeses rejected this offer and attorney Serbin named an arbitrator. USAA increased its settlement offer several times thereafter, beginning July 1, 2003, when it offered to pay $50,000.00. Subsequently, offers of $65,000.00, of $80,000.00 and of $100, 000.00 were made and rejected by the Rhodeses. On December 4, 2003, the Rhodeses again demanded $175,000.00 to settle their claim. On December 22, 2003, USAA informed the Rhodeses' attorney it agreed to pay $175,000.00. They signed a settlement release agreement and accepted the $175,000.00 in final settlement on January 12, 2004.

The Rhodeses contend USAA had no reasonable basis for refusing to meet their $175,000.00 demand sooner. It is the burden of the Rhodeses to prove by clear and convincing evidence that USAA had no reasonable basis for not paying $175,000.00 before January 12, 2004. The Rhodeses maintain it was unreasonable for USAA, initially after the settlement agreement, to require the Rhodeses to agree to not sue USAA for bad faith as a condition for their receiving $175,000.00

The Rhodeses point to a myriad of instances of action and, more often, inaction on the part of USSA that resulted

in an unreasonable delay in the settlement of their claim — for the amount of their demand, $175,000.00. This court determines, and so holds, that the Rhodeses have not presented proof by clear and convincing evidence that USAA caused an unreasonable delay in resolving their claim.

Even as here, where liability is clear, where the value of the claim is not clear, the insurer acts reasonably to investigate the claim. *Williams v. Hartford Casualty Insurance Company*, 83 F. Supp. 2d 567 (E.D. Pa. 2000).

Through their attorney, the Rhodeses notified USAA of their underinsured motorist claim on August 20, 2001. (N.T., Day 3, A.M., p. 41) Linda Barboza, a claims handler employed by USAA, was assigned the case on September 7, 2001. (N.T., Day 3, A.M., p. 46) By letter dated October 5, 2001, attorney Serbin wrote to Ms. Barboza advising her it was "premature to make a claim" since Mr. Rhodes continued receiving medical treatment. (N.T., day 3, a.m., p. 51).

There is no indication in the initial hospital records that Mr. Rhodes complained of neck pain. Although Mr. Rhodes maintained he had been working full-time for Brinks at the time of the accident (N.T., Day 1, P.M., p. 117 and N.T., Day 4, p. 114), a representative of Brinks supplied USAA with a statement indicating Mr. Rhodes was working part-time as of July 1, 2000. (N.T., Day 4, p. 114)

The Rhodeses' statement of demand contained no numeric value for non-economic damages. (N.T., day 3, a.m., p. 75) The wage loss was set at $2,418.60. (N.T., day

3, a.m., p.74) Medical specials were listed at $21,890.25. (Def. ex. G-009)

On June 20, 2002, USAA ran a Colossus report using the statement of demand and medical records, which produced a value on the claim of $9,949.00 to $22,609.00. Colossus is a computer program used as a tool to aid in UIM claim evaluation. (N.T., day 3, a.m., p. 71) Also entered into the computer system was the statement of demand's representation that Mr. Rhodes had suffered a disc herniation in his neck as a result of the accident. (N.T., day 3, a.m., p. 100; def. ex. 16) A member of USSA's Colossus team, Kathy Ortiz, informed Ms. Barboza that disc herniation should not have been entered into the computer system because Mr. Rhodes did not treat for neck injury until more than one year following the accident. (N.T., day 3, a.m., pp. 98-99) At Ms. Ortiz direction, Ms. Barboza substituted neck soft tissue injury for disc herniation. (Ortiz depo., p. 29) The second Colossus run resulted in a value of $0 to $3,209.00 (money in excess of the $65,000.00 the Rhodeses had already received). (N.T. day 3, a.m., pp. 72-73) The second run included $7,500.00 (up from $5,000.00) for disfigurement. (N.T., day 3, a.m., pp. 100-101) The initial offer of $5,000.00, submitted on July 10, 2002, was based on a total value of the claim at $70,000.00. (Def. ex. H-001 and I-001) On July 15, 2002, the $5,000.00 offer was rejected. Also, the Rhodeses' attorney appointed an arbitrator and advised USAA he considered the initial offer was made in bad faith. No counter-demand was made. (Def. ex. J-001-002) USAA transferred the Rhodeses' claim to Alma Trevino on July 29, 2002, because of the demand for arbitration,

i.e., litigation. (N.T., day 1, p.m., p. 7) Also, on July 29, 2002, USAA referred the defense of the Rhodeses' claim to the law firm of Meyer Darragh. (Def. ex. K-001-003) On August 1, 2002, Joel Kornanski, Esquire, of Meyer Darragh, called Ms. Trevino to discuss the assignment. (Def. ex. L-001)

From this point on in the chronology of events leading up to USAA's paying the Rhodeses their settlement demand of $175,000.00 on January 12, 2004, there is a difference in the factual statements of the parties or, more often and more specifically, a difference in the effect the actions or inaction of USAA had on the ultimate outcome of the Rhodeses' claim. The court finds credible the evidence hereafter set forth.

Mr. Rhodes suffered a football injury in 1991, which produced symptoms similar to those he complained of at the time of his written statement under oath to USAA. (Def. ex. B1; N.T., day 2, p. 157) Dr. Agnew conducted an Independent Medical Examination of Mr. Rhodes on November 14, 2002. (Def. ex. B1) Attorney Kormanski received Dr. Agnew's report on December 3, 2002 (N.T., day 4, pp. 99), and sent it to Attorney Serbin on December 10, 2002. (Def. ex. B1-026) and to Ms. Trevino on the same date. (Def. ex. D1-001)

On November 21, 2002, at a pre-arbitration conference, attorney Serbin informed attorney Kormanski that Mr. Rhodes had undergone tests with Dr. Opida and had been referred for a surgical evaluation with a neurosurgeon in December, and Mr. Rhodes would not be ready for an arbitration hearing until the following spring. (N.T., day 4,

p. 18) On December 3, 2002, Mr. Rhodes treated with Dr. Protsko and was referred for an angiogram and a consult with Dr. Kyle Kim. Until that date, neither attorney Kormanski nor USAA had knowledge of Dr. Kim's involvement with Mr. Rhodes' treatment. (N.T., Day 4, pp. 97-98) On December 20, 2002, Dr. Kim recommended cervical surgery and Mr. Rhodes intended to schedule the surgery. (N.T., day 4, p. 104)

The arbitration panel had set April 30, 2003, as the date for the hearing. (Def. ex. A1)

On January 21, 2003, Mr. Rhodes had cervical surgery. (Def. ex. L1) The treatment records of Dr. Opida, a neurologist, contained no reference to Dr. Kim or that Mr. Rhodes was to undergo surgery. (Def. ex. J1) On January 21, 2003, attorney Kormanski received medical records of Dr. Protsko, an associate of Dr. Kim, which contained no indication of surgery being scheduled. (Def. ex. M1)

Dr. Agnew sent attorney Kormanski a supplemental report, dated February 28, 2003, and received by attorney Kormanski on March 17, 2003, which contained no reference to Mr. Rhodes' surgery. (Def. ex. V1; N.T., day 4, p. 116)

As of March 13, 2003, Ms. Trevino anticipated increasing the settlement offer based on additional information from attorney Kormanski. (N.T., day 2, p. 29)

On March 20, 2003, attorney Kormanski called attorney Serbin, to discuss Dr. Agnew's objections to attorney Serbin's subpoena, and learned, for the first time,

Mr. Rhodes had undergone neck surgery in January. (N.T., day 4, p. 43) Attorney Serbin placed USAA on notice at that time that the accident caused Mr. Rhodes to suffer a vascular injury to his neck. (Def. exs. Y1 and A2) This was attorney Kormanski and USAA's first notice Mr. Rhodes suffered a vascular injury. (N.T., day 4, pp. 17-18) On March 20, 2003, attorney Kormanski called Ms. Trevino and advised her of what he had learned. (Def. ex. Z1-002)

On March 21, 2003, attorney Kormanski received Mr. Rhodes' surgery records from the Rhodeses' attorney. He immediately forwarded them to Dr. Agnew for his review and opinion. (N.T., day 4, pp. 4-5) Dr. Agnew authored a March 27, 2003, report wherein he rendered an opinion that the vascular surgery was unrelated to the July 1, 2000, accident. (N.T., day 4, pp. 15-16) Dr. Agnew advised attorney Kormanski that vascular surgery was outside his specialty. (Def. ex. J2)

On March 31, 2003, attorney Kormanski learned the arbitration hearing was continued. (Def. ex., N2)

On April 16, 2003, attorney Kormanski wrote attorney Serbin advising him he was waiting for a medical report from him that would support the Rhodeses' contention that the neck complaints were related to the accident. (N.T., day 4, pp. 26-27)

Following the surgery with Dr. Kim, Mr. Rhodes received an evaluation from Dr. Lukacs, who had treated Mr. Rhodes in 1992 for his 1991 football injury, but not since then. (Def. ex. F3-007) On May 5, 2003, Dr. Lukacs wrote a letter to attorney Serbin stating the need for the January, 2003, neck surgery was caused by the July 1,

2000, accident. (Def. exs. F3-003-006, Y2) The first report of causation received from attorney Serbin was in a June 5, 2003 letter, which included Dr. Lukacs's report and office records. (Def. ex. F3) Dr. Lukacs is a neurologist.

Dr. Moncman conducted an independent medical records review (IMR) of Mr. Rhodes' medical records. On July 14, 2003, attorney Kormanski received Dr. Moncman's report. (N.T., day 3, p. 80; def. ex. W3) Dr. Moncman provided a second report, dated July 21, 2003. (N. T., day 4, p. 40) Dr. Moncman opined there was no way a conclusion could be reached with reasonable medical certainty that the motorcycle accident caused Mr. Rhodes to have vertebrobasilar symptoms one year later. (Def. ex. W3) In Dr. Moncman's supplemental report, received by attorney Kormanski on July 24, 2003, he advised with reasonable medical certainty, Mr. Rhodes' vertebrobasilar insufficiency was not caused by the accident. (Def. ex. C4)

On October 7, 2003, Dr. Sangiorgio authored a report. In his report, Dr. Sangiorgio opined that Mr. Rhodes' problems were directly a result of the accident on July 1, 2000. (Def. ex. P4) Attorney Serbin sent Dr. Sangiorgio's report to attorney Kormanski and a letter dated October 13, 2003, and made a demand of $160,000.00. (Def. ex. 04) Attorney Kormanski had not received previous reports from Dr. Sangiorgio. (Def. Exs. S002, S4)

On December 2, 2003, attorney Serbin sent to attorney Kormanski Dr. Kim's November 14, 2003 report. (Def. ex. K5) In Dr. Kim's report, he stated Mr. Rhodes' prognosis was excellent and it would be reasonable to conclude the accident caused his symptoms or aggravated a pre-

existing condition. (Def. ex. K5) Attorney Kormanski sent copies of Dr. Kim's report to USAA, Dr. Agnew and Dr. Moncman. (Def. exs. L5, M4)

In a letter dated December 4, 2003, attorney Serbin increased the Rhodeses' demand to $175,000.00. (Def. Ex. N5) In a letter dated December 22, 2003, attorney Kormanski advised attorney Serbin that USAA agreed to pay $175,000.00. (Def. ex. E5)

By the time of the settlement of the Rhodeses' claim, USAA had in its possession two reports from Dr. Moncman and three reports from Dr. Agnew that the July 1, 2000 motorcycle accident did not cause Mr. Rhodes to suffer any type of neck injury nor was there a need for neck surgery. (N.T., day 4, p. 46)

Attorney Kormanski, soon after he was retained, informed USAA he did not necessarily believe the value of the Rhodeses' UIM claim was more than $5,000.00, on top of the $65,000.00 they already had received. However, there are uncertainties with litigation and expenses and he could see a willingness to move to a higher amount to settle the claim. (N.T., day 3, p.m., p. 129)

Alma Trevino did not increase Linda Barboza's offer of $5,000.00 because she believed she would not be able to offer enough money to satisfy the Rhodeses, and she had no report causally linking Mr. Rhodes's disc herniation, which was included in the settlement demand, to the accident. (N.T., Day 2, p. 29)

In attorney Kormanski's letter of June 3, 2003 to Ms. Trevino, he advised her that Dr. Lukacs report of June

5, 2003, was the first provided by the Rhodeses that confirmed a causal relationship between Mr. Rhodes's neck complaints and Dr. Kim's surgery to the motorcycle accident. (Def. ex. 13)

The court determines the opinions of the Rhodeses' expert, James Chett, are not supported by the evidence and rejects his opinions regarding the reasonableness of the 18-20 months delay in USAA's paying the settlement demand of $175,000.00

The Pennsylvania Unfair Methods of Competition and Unfair or Deceptive Acts or Practices applies here. This court concludes USAA did not violate Section (a)(10) of 40 P.S. §1171.5.

Violations of the Pennsylvania Code at 31 Pa. Code §145.6 and/or §146.7(c) do not constitute clear and convincing evidence of bad faith. *Williams v. Hartford Casualty Insurance Company, supra* at 576.

If any reasonable basis for insurer's action existed, there is no bad faith under section 8371. *MP III Holdings, Inc. v. Hartford Cas. Ins. Co.*, 2011 U.S. Dist. LEXIS 72370 (E.D. Pa. June 30, 2011). A reasonable basis is all that is required to defeat a claim of bad faith. *Horowitz v. Fed. Kemper Life Assurance Co.*, 57 F.3d 300, 307 (3d Cir. 1995), and *J.C. Penney Life Insurance Co. v. Pilosi*, 393 F.3d 356, 367 (3d Cir. 2004).

It is not bad faith for an insurance company to contest an underinsured motorist claim. *Condio v. Erie Ins. Exch.*, 899 A.2d 1136 (Pa. Super. 2006).

For delay to amount to bad faith, the insured must prove

by clear and convincing evidence that the insurer had no reasonable basis for its actions which resulted in delay. *Thomer v. Allstate Insurance Company, supra.* Such is the case before this court. There were causes of delay on the part of USAA, but virtually all of them were as result of the pace of litigation and none were unreasonable.

In Rhodes I, the Superior Court determined the trial court had erred in holding that the Superior Court in *Bonenberger v. Nationwide Mutual Insurance Co., supra.,* precluded consideration of evidence as to USAA's IOP's and claims philosophy. (pp. 21-25) In reaching its decision here, this court considered as evidence USAA's adherence to its own Intelligent Operating Procedures ("IOP's") and claims philosophy, as well as to the UIPA and provisions of the Pennsylvania Code, 31 Pa. Code §146.1 et seq. *See Lappile v. AMEX Assurance Co.,* 928 A.2d 251 (Pa. Super. 2007). The court is satisfied USAA complied sufficiently with the IOP's, claims philosophy and UIPA to defeat a bad faith claim.

The Superior Court in Rhodes I, agreed with the trial court's conclusion that Linda Barboza's conduct on behalf of USAA raised a question of material fact as to whether her acts and omissions had a reasonable basis. (pp. 14-15 and fn. 5) This court has determined that such acts and omissions did not unreasonably delay USAA's paying the Rhodeses' claim. The Superior Court was critical of the conduct of other USAA personnel, particularly Alma Trevino. (p. 18) This court has determined that her conduct did not unreasonably delay the settlement of the UIM case.

Regarding USAA's maintaining it did not meet the

Rhodeses' settlement demand more promptly because it did not have a physician's report causally linking Mr. Rhodes's neck injury to the accident, the Superior Court believed it posed a question of material fact. (Rhodes I at pp. 18-19) This court determines the credible evidence supports USAA's position. Settlement was reached in approximately 6 months after USAA received such a physician's report.

This court finds credible attorney Kormanski's explanation of the sentence that appeared in his September 15, 2002, letter to Ms. Trevino, which reads as follows: "....Dr. Agnew will be able to refute any casual connection between claimant's disc injuries in his neck and the subject accident." He referred to it as a typographical error. It is noted that attorney Kormanski also believed it "would be difficult" to convince arbitrators that the disc injuries came from something other than the motorcycle accident. This court does not find there was collusion between attorney Kormanski and/or USAA and Dr. Agnew.

All objections made during depositions are overruled.

The Rhodeses have requested the court apply the missing witness rule and find that the testimony of Linda Barboza, Kathy Ortiz, Fred Philip Brookes, Paul Kinney, and Timothy Hanley would have been unfavorable to USAA had their testimony been presented at trial or secured before trial. This court declines to do so.

## CONCLUSION

Plaintiffs have not proven by clear and convincing evidence that the time between May 17, 2002, when defendant USAA received the Rhodeses' initial settlement

demand of $175,000.00, and January 12, 2004, when they received $175,000.00 in final settlement of their UIM claim was an unreasonable passage time under the circumstances of this case. Neither has it been proved by clear and convincing that the actions of USAA personnel and its attorney were unreasonable.

Even though liability was not contested, USAA had a reasonable basis for defending the damages claim. USAA was not informed of Mr. Rhodes's neck surgery until March, 2003, and not provided a physician's report by the Rhodeses connecting the neck injuries of Mr. Rhodes to the motorcycle accident until June, 2003. USAA had reports in its possession that there was no causal connection. With this new information, USAA did increase its offer in July, 2003. Five months later, the parties agreed to a settlement. That is not an unreasonable delay.

Delays in this case were caused by the reasonable pace of the litigation.

Because of its determination that there has not been unreasonable delay in the resolution of the Rhodeses' claim caused by USAA's not having a reasonable basis for paying the Rhodeses' settlement demand sooner, the court need not address whether USAA knew or recklessly disregarded its lack of a reasonable basis.

### ORDER

And now, July 18, 2013, the verdict in the above-captioned case is entered in favor of defendant USAA Casualty Insurance Company and against plaintiff William F. Rhodes, Jr. and Carrie E. Rhodes, his wife.