## Webber v. Erie Insurance Exchange

C.P. of Northampton County, No. C-48-CV-2011-07374

*Steven J. Margolis*, for plaintiffs.
*Eric R. Brown*, for defendants.

KOURY, *J.*, November 14, 2013—This matter is before the court on the motion of defendants Erie Insurance Exchange, Erie Insurance Group, Erie Indemnity Company, and Erie Insurance Company (collectively, "Erie") for partial summary judgment on counts III and IV of the amended complaint filed by plaintiffs Patrick and Heather Webber (collectively, "Webber"). For the reasons set forth below, we hold that, because there are genuine issues of material fact with respect to Webber's claims, Erie's motion for summary judgment must be denied.

## BACKGROUND

### I. Webber's Car Accident

On May 23, 2006, Webber was involved in a car accident. *See* defendants' motion for partial summary judgment as to counts III and IV of plaintiffs' amended complaint ¶2, *Webber v. Erie*, No. C-48-CV-2011-7374 (C.P. Northampton Co. Aug. 29, 2013) ("motion"); plaintiffs' answer to defendants' motion for partial summary judgment as to counts III and IV of plaintiffs' amended complaint ¶2, *Webber v. Erie*, No. C-48-CV-2011-7374 (C.P. Northampton Co. Sept. 13, 2013) ("answer"). Prior to the accident, Webber had suffered from degenerative disc disease, for which he had been treated by orthopedist Dr. Vito Loguidice ("Dr. Loguidice"). *See* Am. Compl. ¶¶15, 19, *Webber v. Erie*, No. C-48-CV-2011-7374 (C.P. Northampton Co. Oct. 12, 2011) ("Am. Compl."). Webber's treatment for the degenerative disc disease had ended on February 9, 2006, and he had been told to return to normal duties. *See id.* ¶15. Following his car accident, Webber

experienced new symptoms and resumed treatment with Dr. Loguidice. *See id.* ¶15-19.

An MRI showed that Webber had a herniated disc at L5-S1. *See id.* ¶17. On June 19, 2006, Dr. Loguidice advised Webber that a long-term solution would likely require surgery. *See id.* ¶18.

II. Webber's Claim for First-Party Medical Benefits

Webber sought first-party medical benefits under a policy of insurance issued by Erie. *See* motion ¶3; answer ¶3. Although Pennsylvania law required minimum coverage of only $5,000, Webber had paid extra premiums to obtain $100,000 in coverage. *See* Am. Compl. ¶10. In addition, the policy provided $500,000 in underinsured motorist ("UIM") benefits. *See* motion ¶11; answer ¶11.

The claims adjuster assigned to handle Webber's claim for first-party medical benefits was Jennifer Koplin ("Koplin"). *See* deposition of Jennifer Koplin at 11, 18, *Webber v. Erie*, No. C-48-CV-2011-7374 (C.P. Northampton Co. May 16, 2013 and June 27, 2013) ("Koplin Dep."). At her deposition, Koplin testified that if Webber's May 23, 2006 car accident had either caused a new injury or exacerbated his preexisting condition, Erie would have been required to provide coverage. *See id.* at 125. She said that as of June 21, 2006, she knew that Dr. Loguidice had recommended surgery, which could cost $60,000 to $80,000. *See id.* at 122-23. Koplin, however, did not adjust her valuation of Webber's claim to reflect the cost of the surgery because she was unsure whether Webber's complaints were continuing symptoms of his preexisting condition or new symptoms of injury or exacerbation of his preexisting condition caused by the car accident. *See id.*

On July 6, 2006, after Webber submitted Dr. Loguidice's

bills for payment, Koplin sent Dr. Loguidice a letter stating:

> At your earliest convenience, please provide the details as to how you are arriving at the conclusion that Mr. Webber's current complaints are a direct result of the May 23, 2006 accident, in light of the degenerative nature of the problem and in light of Mr. Webber's extensive preexisting problems in this area. We will be unable to complete our review of all current and future charges submitted until we receive the above-requested documentation.

Plaintiffs' brief in opposition to defendants' motion for partial summary judgment as to counts III and IV of plaintiffs' amended complaint, *Webber v. Erie*, No. C-48-CV-2011-7374 (C.P. Northampton Co. Sept. 13, 2013) ("Pl. Br."), Ex. D. On July 13, 2006, Dr. Loguidice replied to Koplin, stating: "[Webber's] present pain complaints are most likely a result of pre-existing lumbar degenerative disc disease that was exacerbated by the May 23, 2006 motor vehicle accident." *Id.*, Ex. E. As noted above, Koplin testified that if Webber's car accident either caused a new injury or exacerbated a preexisting condition, Erie was required to provide coverage. *See* Koplin Dep. at 125.

III. Webber's Acupuncture Treatments

Rather than proceed immediately with surgery, Webber opted to begin by trying a more conservative treatment. *See* Am. Compl. ¶19. Thus, on June 29, 2006, Dr. Loguidice referred Webber to acupuncturist David Molony ("Molony"). *See id.* ¶¶19-20. On August 4, 2006, Webber began treating with Molony. *See id.* ¶20.

Approximately four months later on December 21, 2006, Koplin closed Webber's file, notwithstanding

her knowledge that he was still receiving acupuncture treatments. *See* Koplin Dep. at 134-35. At Koplin's deposition, she testified that Erie's claims manual instructs claims adjusters not to close a file without first contacting the insured's treating physicians to inquire whether additional treatment is required. *See id.* at 37, 63-64, 90. Koplin said she could have called Webber's acupuncturist but chose not to do so. *See id.* at 134-35. When she was asked why she failed to follow Erie's procedures for closing a file, she said, "Unfortunately, the volume of claims sometimes that we have to handle, it — it's not always possible to follow everything to the exact letter." *Id.* at 137-38.

On February 28, 2007, Erie notified Webber that it had requested peer review of his acupuncture treatments and would not pay for any further treatments until completion of the peer review process. *See* Am. Compl. ¶20. The reviewer retained by Erie concluded that no acupuncture treatments were reasonable after August 28, 2006. *See id.* ¶22. Webber appealed. *See id.* ¶23. On appeal, a different reviewer concluded that all of the acupuncture treatments were reasonable and necessary for twelve months after the accident. *See id.* However, because the report was issued after the twelve months had already elapsed, no further treatments were authorized. *See id.* Erie subsequently paid the bills that Webber had incurred prior to the peer review process. *See id.*

IV. Erie's Continuing Investigation

After Erie's February 28, 2007 decision to withhold benefits for Webber's acupuncture treatments, Webber returned to Dr. Loguidice. *See id.* ¶24. Webber resumed treatment with Dr. Loguidice on April 10, 2007. *See* Pl. Br., Ex. L. Dr. Loguidice again advised Webber that long-term alleviation of his symptoms would require surgery.

*See* Am. Compl. ¶29.

On April 17, 2007, Koplin sent Dr. Loguidice a letter stating:

> At your earliest convenience, please explain in greater detail how Mr. Webber's current complaints are causally related to the motor vehicle accident of May 23, 2006, when you have not been treating him since June 9, 2006, in light of the apparent aggravating factors involving his job. Please advise if there has been any new trauma or injury since June 2006. We will be unable to make a benefit determination on all current and future charges submitted until we receive the above-referenced documentation.

Pl. Br., Ex. H. On May 18, 2007, Koplin sent Dr. Loguidice the same letter a second time. *See* Pl. Br., Ex. K.

When Koplin was asked at her deposition where she learned of "apparent aggravating factors involving [Webber's] job," she testified that she took that information from Dr. Loguidice's notes, which indicated that Webber did "quite a bit of walking and standing at work." Koplin Dep. At 148-49. When she was asked how she concluded that walking and standing were "aggravating factors," she said, "Well, it's — I'm reading between the lines...." *Id.* at 168-69.

On June 13, 2007, Dr. Loguidice sent Koplin a letter stating:

> Mr. Webber had pre-existing lumbar degenerative disc disease and he was asymptomatic. After the 5-23-06 motor vehicle accident his symptoms worsened and they never really returned to the pre-accident level of pain. However, he did have a job that was very physical and I am sure to some degree exacerbated his

symptoms.

When he was last seen on 4-24-07 he had an MRI scan that was consistent with a herniated disc at L5-S1, a more acute process.

The above information is stated with a reasonable degree of medical certainty.

Pl. Br., Ex. I.

On June 28, 2007, Dr. Loguidice responded to Koplin's May 18, 2007 communication when she had sent him the second copy of her April 17, 2007 letter. Pl. Br., Ex. L. In his response, he stated:

There was a long hiatus between [Webber's] office visit of June 29, 2006 and the next time I saw him on April 10, 2007. However, during that time his back pain and leg pain never really resolved and he had the same symptoms. They were waxing and waning.

His present job is definitely contributing to his level of pain and is exacerbating the underlying L5-S1 disc herniation.

To my knowledge there has been no new trauma, just the repeated stresses of work.

He was laid off from April of 2007 and when I saw him later that month he definitely had less pain when he wasn't working. It is my opinion that the disc was injured as a result of the motor vehicle accident of May 23, 2006. Although it has resorbed in part based on new MRI scan, it has never really become asymptomatic. This original disc injury is exacerbated by his work and both are contributing to his present pain complaints.

*Id.* Thus, although Dr. Loguidice acknowledged that

Webber's preexisting condition and current work stresses were contributing to his symptoms, Dr. Loguidice's conclusion remained firm that the May 23, 2006 accident had caused injury and/or exacerbated Webber's preexisting condition. As noted above, Koplin testified that if Webber's car accident either caused a new injury or exacerbated a preexisting condition, Erie was required to provide coverage, even if Webber's symptoms were being further exacerbated by stresses from his work. *See* Koplin Dep. at 125. Nevertheless, even after Koplin received Dr. Loguidice's June 28, 2007 letter detailing the basis for his opinion that the accident had caused new injury and exacerbated Webber's preexisting condition, Koplin did not increase her valuation of Webber's claim. *See id.* at 131-32.

V. Erie's Request for an IME

On June 18, 2007, Koplin wrote a note in Erie's claims log to her supervisor, Lisa Balch, asking whether she should seek an independent medical examination ("IME") of Webber in light of Dr. Loguidice's acknowledgement that Webber's job duties were contributing to his symptoms. *See* Pl. Br., Ex. M; Koplin Dep. at 34. Koplin testified that Erie's claims manual sets forth certain grounds for requesting an IME but that there was only one ground that applied to Webber, i.e., "the treating providers are unable or unwilling to give a definitive conclusion with regard to medical causation." Koplin Dep. at 71-79, 98. Koplin acknowledged that Dr. Loguidice had given a conclusion with regard to medical causation. *See id.* at 73. However, she said she did not regard his conclusion as definitive, "because he mentioned aggravations from [Webber's] work being a contributing factor to his symptoms and also preexisting issues were in question." *Id.* Dr. Loguidice's letters clearly stated that he had already considered these

factors in reaching his conclusion. Thus, it was apparent that Koplin questioned his conclusion.

Balch approved Koplin's decision to seek an IME. *See* Deposition of Lisa Balch at 36-37, *Webber v. Erie*, No. C-48-CV-2011-7374 (C.P. Northampton Co. July 9, 2013) ("Balch Dep."). Balch acknowledged at her deposition that she and Koplin never considered any of the grounds set forth in Erie's claims manual for requesting an IME. *See id* at 36. When asked whether she had considered Dr. Loguidice's letters, Balch said she did not recall what she had considered. *See id.* at 39.

Although Erie's claims manual required claims adjusters to submit a form to the medical department at Erie's home office for review by its nursing staff prior to seeking an IME, Koplin testified that she did not submit such a form in Webber's case, because Balch told her it was unnecessary. *See* Koplin Dep. at 48-50. Balch testified that she believed that Erie's policy on the use of this form had changed at some point in time but that she could not remember whether it had changed before or after Webber's case. *See* Balch Dep. at 28-31. Balch further acknowledged that according to Erie's claims manual, before an IME was performed, the claims adjuster was required to "conference" the claim. *Id.* at 33-34. However, she said she had never performed a claims file conference, had never been trained to perform one, and disagreed with the statement in Erie's manual that claims conferencing was an "integral part" of Erie's claims process. *Id.*

When Balch was asked whether she was aware that Dr. Loguidice had provided a conclusion on medical causation, she testified, "Do I agree in that line that he says it's motor vehicle related, no, I don't." *Id.* at 41-42. She acknowledged that she had no medical training and that Erie had medical staff to review requests for IMEs, but

she said she felt that Koplin's assessment was appropriate, and she was not concerned that she and Koplin were not following the procedures set out in Erie's claims manual. *See id.* at 52-53. She said, "[M]y understanding is that those are not the only scenarios for an IME." *Id.* at 53. She said she was not sure whether anyone at Erie's home office was supervising the claims adjusters on a regular basis to ensure that they were complying with the procedures in the claims manual. *See id.* at 54-55.

VI. Erie's Conduct During the IME Process

Erie chose Dr. Walter Finnegan ("Dr. Finnegan") to conduct Webber's IME. *See* Am. Compl. ¶45. Koplin testified that according to Erie's claims manual, adjusters "should not do anyth ing to influence the results of any [IME]." Koplin Dep. at 103. Nevertheless, on June 25, 2007, Koplin wrote to Dr. Finnegan and asked, "Is the resumption of treatment with Dr. Loguidice on April 10, 2007 still related to the car accident of May 23, 2006 in light of the aggravating factors involving [Webber's] job?" Pl. Br., Ex. J.

On August 28, 2007, Erie filed a petition to compel an IME. *See* Am. Compl. ¶7. On November 27, 2007, the court ordered Webber to submit to the IME. *See* motion ¶¶7-8; answer ¶¶7-8. Although Webber alleged that Erie had made misrepresentations to the court, Webber did not appeal the order. *See* motion ¶9; answer ¶9; Am. Compl. ¶¶36-37.

On December 17, 2007, Webber submitted to an IME by Dr. Finnegan. *See* Am. Compl. ¶45. On the same day, Dr. Finnegan submitted a report stating his preliminary conclusion that "Patrick Webber did sustain a lumbar sprain/strain at the time of the index event, causing at least a transient subjective aggravation of preexisting disease."

Motion ¶5, Ex. B, at 0723; answer ¶5; Am. Compl. ¶45. However, Dr. Finnegan stated that in order to finalize his opinion, he would need to review certain additional medical records, including X-rays performed by Dr. Loguidice's office. *See* motion ¶5, Ex. B, at 0723; answer ¶5.

On February 16, 2008, Dr. Finnegan submitted an addendum to his report stating that he had received and reviewed certain of the records he had requested; that those records reinforced his earlier opinion; and that he was still awaiting some additional records, including the X-rays by Dr. Loguidice. *See* motion ¶5, Ex. B, at 0725. Dr. Finnegan never received the requested X-rays from Dr. Loguidice. *See id.* at 0727. When Balch was asked why she and Koplin never sent Dr. Finnegan the X-rays he had requested, she gave no explanation. *See* Balch Dep. at 115-17.

On March 3, 2008, Dr. Finnegan submitted a second addendum to his report stating that in his opinion, the accident had caused "no new injury and no significant aggravation of pre-existing disease." Motion ¶5, Ex. B, at 0727. On March 14, 2008, Erie informed Webber that it would not pay for any further treatment by Dr. Loguidice. *See* motion ¶6; answer ¶6.

VII. Erie's Withholding of Payment for Webber's Medical Bills

Koplin acknowledged at her deposition that as long as an insured's treating physician has stated that there is a causal relationship between the accident and the insured's injuries and the insurer has not requested peer review or medical records, the law requires the insurer to pay the insured's medical bills within thirty days, even while the insurer is awaiting an IME. *See* Koplin Dep. at 56-57,

88-89. She said that Erie's claims manual states that bills must be paid within thirty days of proof of loss in order to comply with the unfair claims practices act. *See id.* at 26-27. Nevertheless, Koplin testified that Erie's standard practice is to withhold payment of medical bills pending the outcome of an IME. *See id.* at 56-57, 60-63. Koplin said she held Dr. Loguidice's bills for several months and then refused payment after she received the IME report from Dr. Finnegan. *See id.* at 62. She said that although Dr. Loguidice had stated that there was a causal relationship between the accident and Webber's injuries, she believed that as long as she still had questions about causation, she was entitled to withhold payment of benefits. *See id.* at 63.

Balch testified that Webber did everything required under the terms of his contract with Erie. *See* Balch Dep. at 104. However, she confirmed that, notwithstanding any requirements of the law, it was her standard practice to withhold payment of all medical bills while awaiting an IME. *See id.* at 106-08.

VIII. Webber's Claim for UIM Benefits

On August 2, 2007, the third-party tortfeasor in Webber's car accident tendered his full policy limit of $15,000 in settlement of Webber's claim against him. *See* Am. Compl. ¶33. Webber submitted a claim for UIM benefits under the Erie policy. *See* motion ¶10; answer ¶10. The policy provided that if the parties could not agree as to the value of a UIM claim, the matter would be submitted to binding arbitration. *See* motion ¶11; answer ¶11.

The Erie claims adjuster assigned to handle Webber's UIM claim was Sharon Achey. *See* deposition of sharon achey at 19-21, *Webber v. Erie*, No. C-48-CV-2011-7374 (C.P. Northampton Co. June 27, 2013) ("Achey Dep."). On January 23, 2009, Achey valued Webber's UIM claim

at $20,000 to $35,000. *See id.* at 35-37. On February 3, 2009, Erie's counsel made an offer to settle Webber's UIM claim for $15,000, which was below the lowest value Erie had placed on the claim. *See* Pl. Br., Ex. R.

On March 10, 2009, Webber's counsel signaled his willingness to negotiate by asking Erie to reassess the value of the claim in light of the fact that Webber's injury would require surgery. *See* motion ¶12; answer ¶12; Pl. Br., Ex. S. Erie declined to submit a new settlement offer. *See* Am. Compl. ¶51. Webber never made a demand to resolve the UIM claim for any specific amount less than the policy limit of $500,000. *See* motion ¶12; answer ¶12. However, the parties agreed to proceed to a "high-low" arbitration, with an agreed high of $400,000 and an agreed low of $50,000. *See* motion ¶13; answer ¶13.

On November 23, 2009, in preparation for the arbitration, Webber was evaluated by Dr. Robert W. Mauthe ("Dr. Mauthe"), an independent medical examiner. *See* Am. Compl. ¶49. The same day, Dr. Mauthe submitted a report in which he stated that (1) "the aggravation of the intervertebral disc syndrome is a direct result of the motor vehicle accident on 5/23/06"; and (2) Webber might be "a candidate for surgery consisting of a disc replacement or lumbar fusion." *Id.*

Erie's claims log reflects that on January 14, 2011, Erie's UIM attorney told Achey:

The panel is going to see in the testimony of Dr. Loguidice that he recommended lumbar disc surgery and that would be a cost of $60,000 to $80,000. We really cannot say that [Webber] still has [first party benefits] available to cover future treatment, since [Erie] obtained a court-ordered IME and [first party benefits] were cut.

Pl. Br., Ex. T; Achey Dep. at 44.

Despite this comment by its attorney, Erie made a motion *in limine* to preclude evidence of Webber's future treatment costs on the ground that they were "paid or payable" through first-party medical benefits. Motion *in limine* ¶7, Pl. Br., Ex. U. In its motion, Erie stated:

> Even if the arbitration panel were to rule that Dr. Loguidice could testify about the cost of possible future medical treatment, the costs of such treatment should not be considered by the arbitration panel as part of the plaintiff's under insured motorist claim since there remains sufficient medical benefits coverage under the Erie auto medical benefits section of the Erie policy to cover the cost of possible future surgery, if Mr. Webber undergoes surgery, and if Mr. Webber proves that the surgery was necessitated by his injuries from the subject accident.

*Id.*

On February 10, 2011, following a further conversation with Erie's UIM attorney, Achey made the following note in the claims log: "THE DUTY OF THE ARBITRATION PANEL IS TO PUT A NUMBER ON THE VALUE OF THE CASE. TH [sic] PANEL NEEDS TO DECIDE WHETHER OR NO [sic] THE MOTION IN LIMINE WAS FILES [sic] IF THE TX [treatment] WAS RELATED TO THE MVA [motor vehicle accident]." Pl. Br., Ex. V. As reflected in this note, Achey acknowledged that regardless of whether Erie filed its motion *in limine*, the arbitration panel would be required to decide whether the accident had caused Webber's injuries.

On February 16, 2011, Achey made the following note in the claims log:

[WEBBER'S COUNSEL] WANTS THE PANEL TO RENDOR [sic] A WRITTEN OPINION AS TO WHETHER OR NOT THE FUTURE TX [treatment] AND SURGERY IS CASUALLY [sic] RELATED TO THE MVA [motor vehicle accident]. [WEBBER'S COUNSEL] WOULD THEN USE THAT WRITTEN OPINION TO RE-OPEN HIS CLIENTS FPB [first-party benefits] FILE AND DEMAND FPB COVERAGE.

Pl. Br., Ex. aa. Achey and Erie's attorney asked the arbitration panel not to write an opinion, and the panel agreed. *See* Achey Dep. at 49-51.

IX. The Arbitration Award and Webber's Request for Reconsideration

The arbitration panel awarded Webber $125,000 ($110,000 for Webber's claim and $15,000 for his wife's loss-of-consortium claim), which was reduced by the $15,000 Webber had received from the third-party tortfeasor, for a molded net award of $110,000. *See* motion ¶14; answer ¶14. Achey testified that she and Erie's attorney were pleased with the amount of the award. *See* Achey Dep. at 50.

On February 16, 2011, Webber's counsel wrote a letter to Koplin stating:

[D]espite your prior allegations that there is a causation question and your retainer of Walter Finnegan, M.D., J.D., and his preparation of a report, ultimately claiming "that there was no new injury and no significant aggravation of pre-existing disease to the lumbar", this has been soundly rejected by the arbitration panel in awarding a six-figure recovery.

Inasmuch as the arbitration panel has accepted that

a serious injury was caused by the subject accident, including a retrolisthesis at L5-S1 and a resulting herniation at the same level, as testified to by both Mr. Webber's treating doctor, Dr. Loguidice and also by plaintiff's independent medical examiner, Dr. Mauthe, I would request that you immediately reimburse all previous medical bills.

Pl. Br., Ex. bb.

On February 17, 2011, Erie's arbitrator sent a letter to Erie's attorney stating: "The panel decided that Mr. Webber did suffer the retrolisthesis, herniated disc and exacerbation of pre-existing conditions because of the car accident in question." Pl. Br., Ex. W. The same day, Erie's attorney emailed the arbitrator's letter to Achey, and the letter became a part of Erie's claim file. *See* Pl. Br., Ex. X. Despite the presence of the arbitrator's letter in Erie's claim file, Achey, Balch, and Koplin each testified that they had never seen it. *See* Achey Dep. at 61; Balch Dep. at 122-23; Koplin Dep. at 272.

On February 18, 2011, Achey wrote a note in Erie's claims log to Koplin and Balch requesting that they contact her after reading the letter from "the attorney." Claim note 105, Pl. Br., Ex. Y. Achey testified that she was referring to the February 16, 2011 letter from Webber's counsel, not the February 17, 2011 letter from Erie's arbitrator. *See* Achey Dep. at 51-53. However, after further questioning, Achey said she could not determine whether the claim note referred to the letter from Webber's counsel or the letter from Erie's arbitrator. *See id.* at 60.

X. Erie's Response to Webber's Request for Reconsideration

Koplin testified that Erie's claims manual requires an adjuster to reconsider the valuation of a claim whenever

Erie receives new information, including reports from treating doctors, peer review boards, medical examiners, or "a finding by a court of law or a jury, [or] an arbitration panel, that you are in fact responsible, a legal determination that you're responsible." Koplin Dep. at 33. Nevertheless, when Webber asked Erie to reconsider its denial of first-party medical benefits based on the arbitration award, Koplin did not contact Erie's arbitrator or UIM attorney or do anything else to pursue the request other than consult with Balch, who advised Koplin to "maintain our denial. We were not going to reconsider the bills at that time." *Id.* at 265-66. By letter dated February 22, 2011, Erie denied Webber's request for reconsideration. *See* Pl. Br., Ex. cc.

XI. Webber's Complaint

On July 20, 2011, Weber commenced this action by filing a praecipe to issue writ of summons. *See* motion ¶1; answer ¶1. In his amended complaint, Webber asserted claims for breach of contract (count I); breach of the duty of good faith and fair dealing (count II); statutory bad faith pursuant to 42 Pa.C.S.A. §8371 (count III); and violations of the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. §201-1 et seq. (Count IV). *See* Am. Compl. ¶¶54-68. On April 2, 2012, count II of the amended complaint was dismissed. *See* motion ¶16; answer ¶16.

Discovery has now been completed. Presently before the court is Erie's motion for summary judgment as to count III (statutory bad faith) and count IV (violations of the UTPCPL) of the amended complaint.

## DISCUSSION

I. Summary Judgment Standard

The court may enter summary judgment on a claim or

defense when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Pa.R.C.P. 1035.2.

> After the relevant pleadings are closed, but within such time as not to unreasonably delay trial, any party may move for summary judgment in whole or in part as a matter of law.

> (1) whenever there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by additional discovery or expert report, or

> (2) if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury.

*Id.* "When considering a motion for summary judgment, the trial court must take all facts of record and reasonable inferences therefrom in a light most favorable to the non-moving party." *Summers v. Certainteed Corp.*, 997 A.2d 1152, 1161 (Pa. 2010). "In so doing, the trial court must resolve all doubts as to the existence of a genuine issue of material fact against the moving party." *Id.*

"The moving party bears the burden of proving that no genuine issues of material fact exist." *Wittrien v. Burkholder*, 965 A.2d 1229, 1232 (Pa. Super. 2009) (quoting *Wright v. Allied Signal, Inc.*, 963 A.2d 511, 514 (Pa. Super. 2008)). However, where the non-moving party bears the burden of proof on an issue at trial, in order to defeat summary judgment, the non-moving party must adduce sufficient evidence to establish a genuine issue of

material fact as to that issue. *See J.P. Morgan Chase Bank, N.A. v. Murray*, 63 A.3d 1258, 1261 (Pa. Super. 2013).

> Where the non-moving party bears the burden of proof on an issue, he may not merely rely on his pleadings or answers in order to survive summary judgment. Failure of a non-moving party to adduce sufficient evidence on an issue essential to his case and on which it bears the burden of proof establishes the entitlement of the moving party to judgment as a matter of law.

*Id.* (quoting *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001)).

"Summary judgment is proper only where the pleadings, depositions, answers to interrogatories, admissions of record and affidavits demonstrate that there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Potter v. Herman*, 762 A.2d, 1116, 1117 (Pa. Super. 2000). Summary judgment is proper only "[w]hen the facts are so clear that reasonable minds cannot differ." *Basile v. H & R Block*, 761 A.2d 1115, 1118 (Pa. 2000).

## II. Webber's Bad-Faith Claims

### A. Elements of a Bad-Faith Claim

"Our Supreme Court has long recognized that 'the utmost fair dealing should characterize the transactions between an insurance company and the insured.'... Moreover, the insurance company has a duty to deal with its insured 'on a fair and frank basis, and at all times, to act in good faith.'" *Berg v. Nationwide Mut. Ins. Co., Inc.*, 44 A.3d 1164, 1170 (Pa. Super. 2012) (quoting D*ercoli v. Pennsylvania Nat. Mut. Ins. Co.*, 554 A.2d 906, 909 (Pa. 1989)). "The duty of good faith originates from the insurer's status as a fiduciary for its insured under the

insurance contract, which gives the insurer the right, *inter alia*, to handle and process claims." *Id.*

The Pennsylvania legislature has created a statutory remedy for bad-faith conduct by an insurance company toward its insured. *See* 42 Pa.C.S.A. §8371.

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
>
> (2) Award punitive damages against the insurer.
>
> (3) Assess court costs and attorney fees against the insurer.

*Id.*

> "Bad faith" on the part of an insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (*i.e.*, good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

*Terletsky v. Prudential Prop. & Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa. Super. 1994) (quoting Black's Law Dictionary 139 (6th ed. 1990)) (citations omitted).

"To prove bad faith, a plaintiff must show by clear and convincing evidence that the insurer (1) did not have a reasonable basis for denying benefits under the policy and

(2) knew or recklessly disregarded its lack of a reasonable basis in denying the claim." *Condio v. Erie Ins. Exchange*, 899 A.2d 1136, 1143 (Pa. Super. 2006). The "motive of self-interest or ill will" is not a third element of the claim but, rather, is probative of the second element, whether the insurer knew or recklessly disregarded its lack of a reasonable basis in denying the claim. *See Greene v. United Servs. Auto. Ass'n*, 936 A.2d 1178, 1191 (Pa. Super. 2008). "Bad faith claims are fact specific and depend on the conduct of the insurer *vis a vis* the insured." *Condio*, 899 A.2d at 1143.

"[S]ection 8371 is not restricted to an insurer's bad faith in denying a claim. An action for bad faith may also extend to the insurer's investigative practices." *O'Donnell ex rel. Mitro v. Allstate Ins. Co.*, 734 A.2d 901, 906 (Pa. Super. 1999). Indeed, an insurer may be guilty of bad faith even where there is no denial of benefits. *See Berg*, 44 A.3d at 1177-78.

[W]e find the trial court's focus on the alleged lack of denial of benefits to be confusing in light of the text of section 8371, which sets forth no such requirement to be entitled to damages for the insurer's bad faith. To the contrary, the focus in section 8371 claims cannot be on whether the insurer *ultimately* fulfilled its policy obligations, since if that were the case then insurers could act in bad faith throughout the entire pendency of the claim process, but avoid any liability under section 8371 by paying the claim at the end. As our Supreme Court in [*Toy v. v. Metropolitan Ins. Co.*, 928 A.2d 186, 190 (Pa. 2007)] explained, the issue in connection with claims is the *manner* in which insurers discharge their duties of good faith and fair dealing during the pendency of an insurance claim, not whether the claim is eventually paid.... For purposes of the [insureds']

section 8371 claim, whether [the insurer] ultimately paid the benefits due under the policy is not the relevant inquiry; instead the dispute is whether [the insurer] acted in bad faith in its dealings with [the insureds].

*Id.* (emphasis in original) (citations omitted).

After denying coverage, an insurer has a continuing duty to reevaluate the denial based on new information that comes to its attention. *See Condio*, 899 A.2d at 1145.

[T]he section 8371 good faith duty is an ongoing vital obligation during the entire management of the claim.... Once an insurer identifies a reasonable foundation for denying a claim, it is not relieved of its duty of good faith and fair dealing.... In other words, if evidence arises that discredits the insurer's reasonable basis, the insurer's duty of good faith and fair dealing requires it to reconsider its position and act accordingly, all the while remaining "committed to engage in good faith with its insured."

*Id.* (quoting *Bonenberger v. Nationwide Mut. Ins. Co.*, 791 A.2d 378, 381 (Pa. Super. 2002)) (citations omitted). Thus, under *Condio*, even if an insurer's initial denial of coverage is reasonable, a subsequent failure to reevaluate the denial based on new information violates the insurer's duty of good faith to its insured. *See id.*

Sharp or abusive litigation tactics may be evidence of bad faith in an insurer's earlier denial of coverage. *See O'Donnell*, 734 A.2d at 906 ("[S]ection 8371 was designed to remedy all instances of bad faith conduct by an insurer, whether occurring before, during or after litigation. In so finding, we refuse to hold that an insurer's duty to act in good faith ends upon the initiation of suit by the insured."); *accord CRS Auto Parts, Inc. v. National*

*Geographic Grange Mut. Ins. Co.*, 645 F. Supp. 2d 354, 375 (E.D. Pa. 2009) (evidence of bad-faith litigation tactics is admissible to prove an underlying bad-faith claim under section 8371).[1]

B. Webber's Bad-Faith Claim for Denial of First-Party Medical Benefits

Erie contends that Webber's bad-faith claim as to denial of his first-party medical benefits is barred by the statute of limitations. We disagree.

"Whether the statute of limitations has run on a claim is generally a question of law for the trial judge." *Devine v. Hutt*, 863 A.2d 1160, 1167 (Pa. Super. 2004). A bad-faith claim under Section 8371 is subject to a two-year statute of limitations. *See Ash v. Continental*, 932 A.2d 877, 885 (Pa. 2007); *Adamski v. Allstate Ins. Co.*, 738 A.2d 1033, 1036 (Pa. Super. 1999). The limitations period begins to run at the time of the injury. *See Adamski*, 738 A.2d at 1042. "'For purposes of applying Section 8371, one must look to the date on which the defendant insurance company first denied the insured's claim in bad faith.'" *Id.* at 1043 (quoting *Rottmund v. Continental Assurance Co.*, 813 F. Supp. 1104, 1106 (E.D. Pa. 1992)).

There is "an important distinction between an initial act of alleged bad-faith conduct and separate later acts of such conduct." *Id.* at 1040. A continuing or repeated denial of coverage is merely a continuation of the initial injury and does not constitute a new injury that triggers the beginning of a new limitations period. *See Barbaro v. Old Line Life Ins. Co.*, 785 F. Supp. 70, 70 (E.D. Pa. 1992). Similarly,

---

1. Although this court is not bound by federal court opinions interpreting Pennsylvania law, we may consider federal cases as persuasive authority. *See Cambria-Stoltz Enter. v. TNT Invs.*, 747 A.2d 947, 952 (Pa. Super. 2000).

an insurer's refusal to settle a case and its refusal to defend or indemnify the plaintiff naturally flow from the insurer's initial denial of coverage and do not constitute new injuries that trigger the beginning of a new limitations period. *See Adamski*, 738 A.2d at 1037-43. Although an insurer's sharp or abusive tactics during litigation of an insurance claim may be evidence of bad faith in the earlier denial of the claim, they do not constitute separate acts of bad faith that trigger the beginning of a new limitations period. *See O'Donnell*, 734 A.2d at 906-08; *accord CRS Auto Parts*, 645 F. Supp. 2d at 375.

However, where a plaintiff alleges new and separately actionable instances of bad faith occurring after the initial denial of coverage, the limitations period begins to run from the later acts of bad faith. *See Rottmund*, 813 F. Supp. at 1111 (where insured alleged that insurer "concealed the absence of new facts and circumstances which would justify its denial of its own prior allegations," the date of injury would be the date of the concealment, not the date when coverage was first denied). As noted above, where new evidence or a new development raises a question as to the reasonableness of the insurer's initial denial of coverage, the insurer is required to "reconsider its position and act accordingly," and failure to do so is an independent injury to the plaintiff. *See Condio*, 899 A.2d at 1145. Although *Condio* did not address a statute-of-limitations issue, it held that a refusal to reconsider denial of coverage based on new evidence is a separate injury. *See id.* If refusal to reconsider a denial of coverage based on new evidence is a separately actionable injury, then, by definition, the injury cannot occur until the moment when the insurer receives the evidence and refuses to reconsider its position. Thus, where a bad-faith claim is based on an insurer's refusal to reconsider a denial of coverage based on new information, the limitations period must be deemed to begin running

when the insurer receives the new information and refuses to reconsider its earlier denial of coverage.

Here, Erie denied Webber's claim for first-party medical benefits on March 14, 2008. Webber commenced this action on July 20, 2011, almost three years later. Thus, if the two-year limitations period began to run on the date Erie denied coverage, Webber's bad-faith claim is time-barred. However, Erie denied Webber's request for reconsideration on February 22, 2011, only five months before he commenced this action. Thus, if the two-year limitations period began to run on the date Erie denied Webber's request for reconsideration, Webber's bad-faith claim is not time-barred.

Erie denied first-party medical benefits based on Dr. Finnegan's conclusion that Webber's car accident caused no new injury and no significant exacerbation of Webber's preexisting condition. The UIM arbitration panel's later finding that Webber's car accident did cause new injury and significant exacerbation of Webber's preexisting condition was directly contrary to Dr. Finnegan's opinion. Koplin testified that under Erie's own claims manual, an arbitration panel's finding that Erie is required to provide coverage under a policy would require Erie to reevaluate its earlier denial of coverage under that policy. *See* Koplin Dep. at 33. Thus, Erie's refusal to reconsider its denial of Webber's claim for first-party medical benefits in light of the UIM arbitration panel's finding on medical causation was a new injury that triggered the beginning of a new limitations period. *See Condio v. Erie Ins. Exchange*, 899 A.2d 1136, 1145 (Pa. Super. 2006). Accordingly, we hold that the limitations period began to run on February 22, 2011, the date Erie denied Webber's request for reconsideration, and that Webber's bad-faith claim relating to his first-party medical benefits is not time-barred.

C. Webber's Bad-Faith Claim Relating to His UIM Benefits

Webber argues that Erie's $15,000 offer to settle his UIM claim was unreasonably low in light of the evidence and Erie's own valuation of his claim; that Webber signaled his willingness to negotiate by asking Erie to reconsider its offer and propose a reasonable figure, given the need for surgery costing $60,000 to $80,000; and that Erie's refusal to raise its settlement offer and its insistence on proceeding to arbitration constituted bad faith, in violation of section 8371. Erie responds that the court is compelled to grant its motion for summary judgment, because Webber never countered with a settlement offer for less than the policy limits of $500,000 and therefore cannot prove that Erie would have refused to negotiate a reasonable settlement. Erie contends that, under these circumstances, there are no genuine issues of material fact as to whether it acted in bad faith with respect to Webber's claim for UIM benefits and that Erie is therefore entitled to judgment as a matter of law on that claim. We disagree.

Erie has cited several cases holding that an insured's failure to counter an insurer's settlement offer may be sufficient to preclude a finding of bad faith and support summary judgment for the insurer. *See Johnson v. Progressive Ins. Co.*, 987 A.2d 781, 784-85 (Pa. Super. 2009); *Katta v. Geico Ins. Co.*, 2013 WL 275529, slip op. at *10 (W.D. Pa. 2013); *Hollingsworth v. State Farm Ins. Co.*, 2005 WL 563414, slip op. at *8 (E.D. Pa. 2005); *Quaciari v. Allstate Ins. Co.*, 998 F. Supp. 578 (E.D. Pa. 1998); *Leo v. State Farm Ins. Co.*, 939 F. Supp. 1186, 1191 (E.D. Pa. 1996). However, these cases are inapposite to the facts presented here.

First, in each of the above-cited cases, the insured ignored the insurer's settlement offer, suggesting that no

offer would have been accepted and that further negotiation would have been futile. Here, Webber's attorney did not ignore Erie's settlement offer but signaled his willingness to negotiate by asking Erie to reassess its offer in light of the need for surgery estimated to cost $60,000 to $80,000.

Second, in each of the above-cited cases, the court concluded that the insurer's settlement offer was low but reasonable. Here, by contrast, a jury could reasonably conclude that Erie's settlement offer was not reasonable. There was significant evidence of medical causation and the costs of surgery. Erie's settlement offer was only $15,000, which was less than the lowest value Erie had placed on Webber's claim. The ultimate arbitration award was $125,000, more than eight times higher than Erie's settlement offer.

Third, in each of the above-cited cases, the insurer's low settlement offer was the primary, if not the only, evidence of bad faith. Here, by contrast, there is significant other evidence of bad faith. The court must consider Erie's conduct with respect to the first-party claim in determining whether there was bad faith as to the UIM claim. The claims proceeded on parallel but related paths; both claims required a determination as to whether the accident was the cause of Webber's injuries; and Erie employees conferred with one another at various times as to the interrelationship between the two claims. Based on the evidence in the record, as detailed above, a jury could reasonably conclude that Erie's employees (1) used Webber's preexisting condition as a pretext to deny benefits that they knew were due and owing; (2) demanded peer review for Webber's acupuncture treatments in order to withhold benefits and delay a resolution until the treatments would no longer be authorized; (3) improperly attempted to persuade Dr. Loguidice to change his opinion

on medical causation; (4) substituted their own medical judgment for that of Dr. Loguidice; (5) ignored Erie's own claims procedures by disregarding Dr. Loguidice's conclusion on medical causation in order to obtain an IME and withholding payment of Dr. Loguidice's bills while awaiting the outcome of the IME; (6) improperly attempted to influence Dr. Finnegan's opinion during the IME process; (7) moved to preclude evidence of Webber's medical expenses in the UIM arbitration on the ground that those benefits were "paid or payable" when the only way Webber could have obtained those benefits was to litigate the issue of medical causation; (8) persuaded the arbitration panel not to write an opinion on causation so that Webber would not be able to use the opinion to reopen his first-party benefits claim and avoid costly litigation on the issue of medical causation; (9) were untruthful when they asserted that they had never read the email from Erie's arbitrator detailing the panel's findings on medical causation; and (10) improperly refused to reconsider Webber's first-party benefits claim in light of the arbitration panel's finding of medical causation.

Erie has cited no case in which a court was faced with substantial evidence of an insurer's bad faith, such as that presented here, but nevertheless held that summary judgment was compelled simply because the insured had failed to make a specific settlement offer in response to an unreasonably low offer by the insurer. We find that, based on the evidence in the record, taken together and viewed as a whole, a jury could reasonably conclude that Webber has presented clear and convincing evidence that Erie (1) lacked a reasonable basis for its denial of benefits and knew or acted in reckless disregard of its lack of a reasonable basis for denying Webber's first-party claim; and (2) unreasonably delayed resolution of Webber's UIM claim by refusing to make a reasonable settlement offer and

insisting on proceeding to arbitration. Taking all facts of record and all reasonable inferences therefrom in the light most favorable to the non-moving party, and resolving all doubts as to the existence of a genuine issue of material fact against the moving party, the court finds that Webber has adduced sufficient evidence to establish the existence of a genuine issue of material fact with respect to his claim for statutory bad faith relating to his UIM benefits. Thus, Erie's motion for partial summary judgment as to that claim must be denied.

III. Webber's UTPCPL Claims

A. Elements of a UTPCPL Claim

The UTPCPL provides that "[u]nfair methods of competition and unfair or deceptive acts or practices... are hereby declared unlawful." 73 P.S. §201-3. The prohibited conduct is defined to include twenty specifically enumerated types of activity. *See* 73 P.S. §201-4(i)-(xx). The list is followed by a "catch-all" provision that includes "any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. §201-4(xxi). Webber asserts that Erie's conduct in handling his first-party and UIM claims violates the "catch-all" provision of the UTPCPL set forth in 73 P.S. §201-4(xxi).

Erie contends that in order to state a claim under the catch-all provision of the UTPCPL, a plaintiff must plead all of the elements of common-law fraud and that Webber's claims must fail, because he has not pled or proven either misrepresentations or justifiable reliance. *See* Erie's Br. at 14. We disagree.

The Superior Court recently held, in a thorough and well-reasoned opinion, that a plaintiff need not plead the elements of common-law fraud in order to state a claim

under the catch-all provision of the UTPCPL, because the statute was amended in 1996 to expand the definition of prohibited conduct from "fraudulent" to "fraudulent or deceptive" conduct. *See Bennett v. A.T. Masterpiece Homes at Broadsprings, LLC*, 40 A.3d 145, 155-56 (Pa. Super. 2012) ("Based on the 1996 amendment, catchall provision liability can arise when the plaintiff alleges either fraudulent *or* deceptive conduct.") (emphasis in original); *accord Grimes v. Enterprise Leasing Co., LLC*, 66 A.3d 330, 337 (Pa. Super. 2013) ("[W]hen a plaintiff alleges a claim under the UTPCPL catchall provision under the theory of deceptive conduct, the plaintiff need not prove the elements of common law fraud."); *Berg. v. Nationwide Mut. Ins. Co., Inc.*, 44 A.3d 1164, 1168 & n.2 (Pa. Super. 2012) (citing Bennett and noting that a jury's finding of liability under the catch-all provision of the UTPCPL was not inconsistent with its failure to find common law fraud).

Erie cites three cases in support of its argument that the UTPCPL requires proof of common-law fraud. *See Toy v. Metropolitan Ins. Co.*, 928 A.2d 186 (Pa. 2007); *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425 (Pa. 2004); *Sewak v. Lockhart*, 699 A.2d 755 (Pa. Super. 1997)). We find these cases unpersuasive.

*Sewak* is inapplicable to post-1996 cases, because it involved a claim filed before the 1996 amendment to the UTPCPL catch-all provision. *See Bennett*, 40 A.3d at 155 ("*Sewak* examined the pre-1996 version of the UTPCPL, which required proof of fraudulent conduct; that version is inapplicable to cases involving the post-amendment catchall provision."). Similarly, the court in *Toy* noted that the claims at issue there had been filed prior to the 1996 amendment. *See* 928 A.2d at 188 n.1 ("[The insured's] Consumer Protection Law claims accrued and were brought under the statute that was in effect prior to

the amendments the Legislature made to the statute in 1996."). The court in *Yocca* did not discuss whether it was addressing a pre-1996 or post-1996 claim. However, *Bennett*, *Berg*, and *Grimes*, cited above, reflect the Superior Court's interpretation of Pennsylvania Supreme Court precedents on this issue, including *Yocca*, and we are bound by the Superior Court's interpretation of the law. Thus, we hold that Webber was not required to plead or prove the elements of common-law fraud in support of his UTPCPL claim and that Erie therefore is not entitled to summary judgment on this basis.

## B. Applicability of the UTPCPL to Post-Sale Conduct

Erie contends that the the UTPCPL applies only to conduct occurring prior to the sale of the policy and that the statute therefore does not apply to Webber's claims for deceptive conduct in the handling of his claims, which occurred after the sale. *See* Erie's Br. at 14-15. We disagree.

Erie makes two arguments in support of this position. First, Erie argues that because the bad-faith statute provides for punitive damages and the UTPCPL provides for treble damages, the two claims have inconsistent remedies, and only the more narrow and more recently enacted statute (the bad-faith statute) should apply. *See* Erie's Br. at 14-15. However, in *Berg*, the jury had already found for the insured on a UTPCPL claim, and the Superior Court reversed the trial court's dismissal of the bad-faith claim, stating, "[T]he jury's finding that the insurer violated the UTPCPL constitutes some evidence of the insurer's bad faith." 44 A.3d at 1175. The Superior Court evidently saw no conflict in allowing the plaintiff to pursue both remedies simultaneously. Erie cites no cases holding that the two claims cannot coexist.

Second, Erie points out that in *Toy v. Metropolitan Ins.*

*Co.*, 928 A.2d 186 (Pa. 2007), the Pennsylvania Supreme Court held that the bad-faith statute applies only to conduct occurring after the sale of the policy. *See* Erie's Br. at 15. Erie argues that because the bad-faith statute was enacted to fill a gap in the existing law, the Supreme Court must have concluded that the UTPCPL, which already existed, did not cover conduct occurring after the sale of the policy. *See id.* However, the *Toy* decision did not address whether the UTPCPL applied to post-sale conduct. Moreover, the Pennsylvania Supreme Court has held that section 8371 and the UTPCPL are not mutually exclusive. *See Ash v. Continental*, 932 A.2d 877, 881-82 (Pa. 2007).

> This court has directed that the UTPCPL is to be liberally construed to effectuate its objective of protecting the consumers of this Commonwealth from fraud and unfair or deceptive business practices.... In accordance with this directive, Pennsylvania courts have held that even where the unlawful practice is directly addressed by another consumer-related statute, a plaintiff may nevertheless pursue his action under the UTPCPL since that statute is broad enough to encompass all claims of unfair and deceptive acts or practices in the conduct of any trade or commerce.

*Id.*

Erie has cited only one case holding that a claim involving post-sale conduct cannot be brought under the UTPCPL. *See Bodnar v. State Farm Mut. Ins. Co.*, No. AR08-001337, slip op. (C.P. Allegheny Co. Oct. 27, 2008). Bodnar, an unreported memorandum decision by the Allegheny Court of Common Pleas, has no binding effect on this court. *See Cogan v. County of Beaver*, 690 A.2d 763, 765 (Commw. Ct. 1997) ("[T]he interpretation of a statute by a trial court of one county clearly is not binding precedent for a trial court of another county.");

*Castle Pre-Cast Superior Walls of Delaware, Inc. v. Strauss-Hammer*, 610 A.2d 503, 505 (Pa. Super. 1992) (same). In addition, we find *Bodnar* unpersuasive.

The court in *Bodnar* held that a claim for "unreasonable denial of benefits within the meaning of §8371" could not be brought under the UTPCPL, because a UTPCPL claim must be based on tortious conduct, and under the modern gist of the action doctrine, the court concluded, a claim for unreasonable denial of insurance benefits would be deemed contractual rather than tortious. *See id.*, slip op. at *2 ("The gist of a cause of action of a failure to pay a claim due under an insurance policy is the breach of a contract. A tort remedy may not be pursued."). We disagree that a bad-faith insurance claim would be deemed contractual under the gist of the action doctrine and therefore decline to follow *Bodnar*.

The gist of the action doctrine precludes plaintiffs from recasting ordinary breach of contract claims as tort claims and thereby potentially obtaining types of relief not permitted for breach of contract. *See Hart v. Arnold*, 884 A.2d 316, 339 (Pa. Super. 2005); *Pittsburgh Constr. Co. v. Griffith*, 834 A.2d 572, 581 (Pa. Super. 2003), *appeal denied*, 852 A.2d 313 (Pa. 2004); *Koken v. Steinberg*, 825 A.2d 723, 729 (Pa. Commw.), *appeal quashed*, 834 A.2d 1103 (Pa. 2003).

> When a plaintiff alleges that the defendant committed a tort in the course of carrying out a contractual agreement, Pennsylvania courts examine the claim and determine whether the 'gist' or gravamen of it sounds in contract or tort; a tort claim is maintainable only if the contract is "collateral" to conduct that is primarily tortious.

*Pennsylvania Mfrs. Ass'n Ins. Co. v. L.B. Smith, Inc.*,

831 A.2d 1178, 1182 (Pa. Super. 2003) (quoting *Yocca v. Pittsburgh Steelers Sports, Inc.*, 806 A.2d 936, 944 (Pa. Commw. 2002)). "Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals." *eToll, Inc. v. Elias/Savion Advertising, Inc.*, 811 A.2d 10, 14 (Pa. Super. 2002); *accord Sullivan v. Chartwell Inv. Partners*, LP, 873 A.2d 710, 719 (Pa. Super. 2005). The Superior Court has stated:

> To be construed as in tort…, the wrong ascribed to defendant must be the gist of the action, the contract being collateral. The important difference between contract and tort actions is that the latter lie from the breach of duties imposed as a matter of social policy while the former lie for the breach of duties imposed by mutual consensus. In other words, a claim should be limited to a contract claim when the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied by the law of torts.

*eToll*, 831 A.2d at 14; *accord The Brickman Group, Ltd. v. CGU Ins. Co.*, 865 A.2d 918, 927 (Pa. Super. 2004). Thus, the gist of the action doctrine bars tort claims:

> (1) arising solely from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where the tort claim essentially duplicates a breach of contract claim or the success of which is wholly dependent on the terms of the contract.

*eToll*, 811 A.2d at 19 (citations and quotations omitted). Whether the gist of the action doctrine applies is an issue of law for the court. *See id.* at 15.

"A breach of fiduciary duty claim is barred by the gist of the action doctrine if the fiduciary duty alleged is grounded in contract obligations." *Alpart v. General Land Partners, Inc.*, 574 F. Supp. 2d 491, 499 (E.D. Pa. 2008). "However, claims for breach of fiduciary duty and breach of contract can coexist if the fiduciary duty is based on duties imposed as a matter of social policy *and* if the fiduciary duty is not based on a contractual agreement between the parties." *Id.* (emphasis added) (minority partners' claims for breach of fiduciary duty against majority partner for scheduling its own development projects before those of the partnership were not barred by the gist of the action doctrine, because claim was based on social policy, and alleged misconduct was not covered by any express term of the partnership agreement); *accord Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 103-07 (3d Cir. 2001) (minority venturer's claims for breach of fiduciary duty against majority venturer for theft of trade secrets, self-dealing transactions, and diversion of corporate opportunities were not barred by the gist of the action doctrine, because claims were based on social policy, and alleged wrongs were not covered by any express term of the joint venture agreement).

Here, Webber's claims would not be deemed contractual in nature under the gist of the action doctrine, because they are based on social policy rather than mutual consensus, and the alleged wrongs are not the subject of any express term in Webber's Erie insurance policy. The Pennsylvania Supreme Court has held that bad-faith insurance claims are based on social policy arising out of the insurer's fiduciary duty to its insured and are therefore tortious in nature. *See Ash v. Continental*, 932 A.2d 877, 885 (Pa. 2007) ("[T]he duty under §8371 is one imposed by law as a matter of social policy, rather than one imposed by mutual consensus, and an action to recover damages for

a breach of that duty derives primarily from the law of torts."). In addition, the wrongs alleged by Webber are not covered by any express term of his Erie insurance policy. Webber asserts that Erie forced him to litigate in order to obtain first-party medical benefits to which Erie knew he was entitled; unreasonably delayed resolution of his UIM claim by refusing to make a reasonable settlement offer; manipulated the UIM arbitration to prevent issuance of a written opinion that Webber could use to reopen his first-party benefit claims; and refused to reconsider its denial of first-party benefits in light of the arbitration panel's finding on causation. None of this conduct was covered by any express term of the insurance policy. Thus, under the authorities cited above, we hold that Webber's UTPCPL claims are not contractual under the gist of the action doctrine and may be brought under the UTPCPL simultaneously with Webber's claims for breach of contract and statutory bad faith.

Wherefore, we enter the following:

### ORDER OF COURT

And now this 14th day of November, 2013, upon consideration of the "Motion for Partial Summary Judgment on Counts III and IV of Plaintiffs' Amended Complaint" of defendants Erie Insurance Exchange, Erie Insurance Group, Erie Indemnity Company, and Erie Insurance Company (collectively, "Erie"), the response thereto of plaintiffs Patrick and Heather Webber, and the briefs and arguments presented thereon, it is hereby ordered and decreed that because there exists a genuine issue of material fact, Erie's motion is denied.